## OKLAHOMA NATURAL GAS CO. v. CORPORATION COMMISSION et al.

No. 12894—Opinion Filed June 19, 1923.

(Syllabus.)

1. **Corporation Commission —Public Utility Rates—Basis of Calculation.**
The reasonable value of the property of a public utility used and useful in its public

service at the time the inquiry is made should be taken as the basis of calculation in determining whether rates fixed by the Corporation Commission constitute a fair compensation for the use of the property, so that the owners are not deprived of their property without due process of law.

**2. Same—"Present Fair Value of Property" —How Determined.**

In determining the present fair value of the property of a public utility, neither original cost nor reproduction cost new, considered separately, are determinative, but consideration should be given to both original cost and present reproduction cost, less depreciation, together with all the other facts and circumstances which would have a bearing upon the value of the property, and from a consideration of all these, a fair present value is to be determined.

**3. Gas — Public Utility Rates — Producing Company—Cost of Production Property and Expenses.**

In a proceeding to establish a rate to be charged by a natural gas utility which produces all or a portion of the gas supplied by it, the cost of its production property and the expenses incident to production must be taken into consideration.

**4. Statutes—Construction — Legislative Intent—Change in Wording.**

It is a cardinal rule that in the construction of statutes the legislative intent must govern, and to arrive at the legislative intent the entire act must be considered, together with all other enactments upon the same subject, and when the intention of the Legislature can be gathered from the entire statute, words may be modified, altered, or supplied to give the statute the force and effect which the Legislature intended.

**5. Same.**

Where the plain intent and meaning of the Legislature can be gathered from the context of a statute, in order to give effect to such intention the court, in construing such statute, may substitute or supply a necessary and proper word to attain this result.

**6. Same.**

Where words have been erroneously used in a statute and the context affords the means of correction, the proper words will be deemed substituted.

**7. Gas—Natural Gas Utility—"Public Utility"—Statute.**

Chapter 93, Sess. Laws 1913, construed, and held, that section 1 thereof, defining a public utility, was intended to apply to and include every corporation, association, company, individual, their trustees, lessees or receivers, successors or assigns, except cities, towns, or other bodies politic who own, operate or manage any plant or equipment, or any part thereof directly or indirectly for the production, transmission, delivery or furnishing of natural gas to the public.

**8. Corporation Commission—Public Utility Rate-Making — Burden of Establishing Reasonable Value of Property.**

In a proceeding instituted before the Corporation Commission by a public utility for the purpose of having established a rate to be charged by it for the service rendered, it is incumbent upon such public utility to establish by competent evidence the fair and reasonable value of its property used and useful in the public service at the time of the inquiry.

**9. Same — Reasonable Rate — Deductions from Gross Revenue—Taxes.**

In determining whether a rate to be charged by a public utility is reasonable, it is necessary to deduct from gross revenue the expenses and charges, and all taxes which would be payable if a fair return was earned are appropriate deductions, and there is no difference in this respect between state and federal taxes or between income taxes and others.

**10. Same—Interest on Funded Debt as Operating Expense.**

Interest on notes payable by a public service corporation should not be allowed as an operating expense in arriving at a basis for a rate, as such interest is payable out of the return on the investment.

**11. Same—Interest on Notes.**

Interest on notes payable by a public service corporation is not ordinarily chargeable to operating expenses in order to arrive at a reasonable rate to be charged by such corporation.

**12. Gas — Natural Gas Utility Rate-Making —Cost of Abandoned Leaseholds, Wells, and Lines—Account Chargeable.**

In a proceeding instituted for the purpose of establishing a rate to be charged by a natural gas utility, items charged for canceled and surrendered leaseholds, abandoned wells and lines, and abandoning lines should be charged to the amortization account, and not to operating expenses.

**13. Same—Cost of Drilling Wells—Finding of Corporation Commission—Conclusiveness.**

A finding by the Corporation Commission that a sum expended by a natural gas company for drilling wells was a proper item of expense will be presumed to be correct in the absence of a showing to the contrary.

**14. Corporation Commission—Public Utility Rate-Making—Annual Expenses—Taxes.**

In determining the annual expenses of a public utility, taxes for but one year should be included.

**15. Same—Findings of Commission—Evidence.**

The Corporation Commission should base its findings upon evidence before it. A finding without any evidence to support it is arbitrary and baseless.

**16. Gas—Natural Gas Utility Rate-Making—Reasonableness—Allowance for Depreciation and Amortization—Fiscal History of Company.**

. A natural gas utility is entitled to earn a reasonable return on the investment and a reasonable amount for depreciation and amortization, and in order to determine what is a reasonable amount for depreciation and amortization, it is proper to take into consideration the fiscal history of the company.

**17. Same—Reversal of Order of Corporation Commission.**

Record examined, and held, that the rates established by the Corporation Commission are unreasonable, and that the rates herein fixed should prevail.

Appeal from the Corporation Commission.

Appeal by the Oklahoma Natural Gas Company from an order of the Corporation Commission fixing gas rates to be charged by appellant. Order of the Corporation Commission reversed and rate established.

Ames, Chambers, Lowe & Richardson, for appellant.

E. S. Ratliff, I. J. Underwood, F. E. Murrell, and Henry Snyder, for appellees.

NICHOLSON, J. This is an appeal from an order of the Corporation Commission prescribing rates to be charged by the Oklahoma Natural Gas Company for gas furnished by it to various distributing companies and municipalities in the state.

The Oklahoma Natural Gas Company is a public utility, engaged in the production, purchase, transmission, and distribution of natural gas. It owns the distributing systems and furnishes gas direct to the public in Tulsa, Chandler, Pond Creek, Claremore, Red Fork, Turley, Dawson, Stroud, Davenport, Wellston, Luther, Edmond, Meeker, Arcadia, Kellyville, Midlothian, Depew, Hunter, Nardin, Deer Creek, Lamont, Peckham, Inola, Porter, Ramona, Haskell, Coweta, Shamrock, and Sapulpa. It also furnishes gas to the town of Carney, which town owns its own distributing system and purchases gas from the company at the city gate. It also furnishes gas to various distributing companies owning franchises in Oilton, Duncan, Marlow, Oklahoma City, El Reno, Enid, Yukon, Britton, Guthrie, Bethany, Muskogee, Shawnee, and Wagoner, and to these distributing companies it sells and delivers gas at the city gates or borders.

The commission fixed the rate to be charged such distributing companies at the city gates of the various cities at 25 cents per 1,000 cubic feet for gas for domestic use, and 20 cents per 1,000 cubic feet for gas for industrial use, and in the cities where the appellant distributes gas direct to the public, the rates range from 42 to 55 cents per 1,000 cubic feet for domestic gas, and the rate for industrial gas was fixed at 25 cents per 1,000 cubic feet.

The question presented by this appeal is whether the rates prescribed by the Corporation Commission are reasonable and just. The company contends that such rates, both city gate and distributing, are unreasonable and unjust, and do not and will not render to it a reasonable return upon the value of its property used and useful in rendering the service required of it.

In determining whether the rate is reasonable, it is necessary to ascertain the fair value of the property of the apellant used and useful in its public service business at the time the inquiry was made (San Diego Land & Town Co. v. National City, 174 U. S. 739, 43 L. Ed. 1154; San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 47 L. Ed. 892; Willcox v. Consolidated Gas Company, 212 U. S. 19, 53 L. Ed. 382), for appellant is entitled to a rate which will yield a fair return upon the reasonable value of its property at the time it is being used for the public (Pioneer Tel. & Tel. Co. v. Westenhaver, 29 Okla. 429, 118 Pac. 354) ; and, while there is a diversity of opinion as to the proper method to be employed in determining the value of the property of a public utility, we think the commission in its order announced the correct rule when it said:

"The true rule deduced from a consideration of all the authorities seems to be that the value of the property for rate-making purposes is the reasonable fair value of the property as the same exists at the time the inquiry is made; and that in determining the present fair value of the property neither original cost nor reproduction cost new, considered separately, are determinative, but that consideration must be given both to original cost and present reproduction cost, less depreciation; together with all the other facts and circumstances which would have a bearing upon the value of the property, and from a consideration of all these a fair present value is to be determined."

The commision summarized the evidence on the question of value as follows:

"The property in question was appraised by H. E. Musson for the Oklahoma Natural Gas Company, and by M. E. Durham, then appraisal engineer of the Corporation Commission, for the public. Mr. Musson made his appraisal upon two bases; one original cost, and the other reproduction cost new. Mr. Musson found the original cost of the Oklahoma Natural Gas Company's entire property, including its distribution plants, up to October 31, 1919, to be $16,061,960.70. Mr. J. M. Gayle, of the firm of Musson & Gayle,

made an audit of the vouchers of the Oklahoma Natural Gas Company up to October 31, 1919, and he found that the original cost of the property of the Oklahoma Natural Gas Company, including its distributing systems, up to October 31, 1919, was $16,190,382.40. Mr. Durham completed his inventory as of September 30, 1919, and he found the original cost of only the physical property of the Oklahoma Natural Gas Company to be $13,153,-651.39. Mr. Durham testified, however, that he omitted all overheads, such as cost of organization, engineering and superintendence, law expenditures during construction, and interest during construction, and that he omitted the entire labor item upon the Oklahoma Natural Gas Company's pipe line running from Cement to Walters, a 16 inch line 55 miles long. Mr. Durham testified that the overheads mentioned were proper charges to be considered, and that if he put those in his appraisal and had included the labor item on the pipe line from Cement to Walters, there would have been little, if any, difference between his appraisal and Mr. Musson's. Mr. Durham was directed by the commission only to make an appraisal of the actual physical property of the Oklahoma Natural, and it was for that reason that he omitted the overheads. He omitted the labor items on the pipe line from Cement to Walters because the figures had not been completed and were not available at the time he finished his inventory.

"Mr. Musson's inventory and appraisal of .he entire property on the basis of reproduction new without depreciation up to October 31, 1919, was $33,023,256.94. Mr. Durham testified that the, value of the property on the basis of reproduction new would be 70% greater than on the basis of original cost. Mr. Musson also made an appraisal and inventory of the production and transmission system of the Oklahoma Natural, separate and apart from the distributing systems. He found the value of the production and transmission system, including the Enid system, but excluding Claremore, Ramona, and Inola, and excluding all distributing systems, on the original cost basis up to and including October 31, 1919, to be $13,534,999.70, without depreciation; and he found the value of the same property on the basis of reproduction cost to be $29,023,098.94."

The commission in its order then sets out a table demonstrating how the total value of the property, including the additions thereto, was arrived at, and finds from the evidence that the original cost of the production and transmission systems of appellant, excluding the towns of Claremore, Ramona, and Inola, which towns are not involved in this controversy, and excluding the value of distributing plants in the towns and cities in which it serves the public direct, was the sum of $14,528,879.86, and then says:

"The very least that the commission could take as the value of the property for rate-making purposes would be its original cost. If effect also be given to reproduction cost new, then the value for rate-making purposes would be several million dollars larger than the value shown in Table 1 above. If the original cost be taken as the value for rate-making purposes, then it would seem that that value ought not to be depreciated. In other words, if the company is to be denied in valuations for rate-making purposes the benefit of the increase in the value of its property, that is to say, if it is to be denied appreciation, then it ought not to be charged with depreciation. All of the evidence in regard to the depreciation was that it amounted to 18%; and in any event, if the commission is to give any effect whatsoever to the testimony in regard to the reproduction value of the property, the increase in the value of the property as represented by its reproduction cost is much more than sufficient to offset the depreciation. For present purposes, therefore, the commission will take as the value of the production and transmission system of the Oklahoma Natural Gas Company, including the general system and the Enid system, but excluding Claremore, Ramona, and Inola. the sum of $14,528,879.86."

The commission then found the total annual expense of the business to be $3,955,059.-15. In arriving at the total value of the property for rate-making purposes there was added to the original cost 10 per cent. for going-concern value, though all the evidence was to the effect that the going-concern value of the property of the appellant was 15 per cent., and there was also added a working capital consisting of 1½ months' expense, which made a total value for rate-making purposes of $16,476,150.24. The order of the commission then recites that all of the witnesses who testified on the subject testified that depreciation and amortization would run from 12 to 15 per cent., and that by allowing only 10 per cent. therefor and 10 per cent. for dividends or interest on the investment, the company should earn the sum of $6,279,865.88, and to do this would require a rate of 42.5 cents per 1,000 cubic feet; that if 8 per cent. were allowed as return on the investment and 8 per cent. for depreciation and amortization, the amount to be earned would be $5,620,819.88, which would require a rate of 38.2 cents per 1,000 cubic feet. The commission then recited that depreciating the original cost of the property 18 per cent., or $2,615,198.37, would leave the value of the property for rate-making purposes $13,-599,432.03, and by allowing 8 per cent. for return and 8 per cent. for depreciation and amortization, the company on this basis would be entitled to earn $5,160,544.96, which would require a rate of 35.2 cents per 1,000 cubic feet. The commission in its order then said:

"The commission does not rule that the Oklahoma Natural Gas Company is restricted to the original cost of its property as a rate basis. It does hold, however, that inasmuch as the reproduction cost new, less depreciation, is very much greater than the original cost, then the original cost is the smallest value upon which it could be contended that the rates should be fixed. Since the evidence was taken in this case there have been some slight reductions in the cost of pipe lines and compressor stations and in the cost of labor. The commission finds that at the time this case was instituted, and at the time the evidence was introduced, the value of the production and transmission system of the Oklahoma Natural Gas Company, including the general system and the Enid system and excluding Claremore, Ramona and Inola, was not less than $14,528,879.86, plus going-concern value and working capital, and that the value of the property at this time is slightly less than that.

"Since that time the price of oil has gone down so that fuel oil is now sold very cheaply in competition with gas.

"During the time covered by the hearings in this cause, and since the closing of the case, the price of gas at the mouth of the well has unquestionably declined until at the present time gas can be purchased at least one-third less cost to the company at the well than at the time of the hearings. The commission has an independent knowledge of this fact and, in making the order herein, does not take as conclusive the testimony with reference to the price of gas to the Oklahoma Natural Gas Company shown by it to have been paid as justifying the rate adduced by the tabulations presented at that time.

"Upon a consideration of all the facts and circumstances, the commission hereby establishes a city gate rate to be charged by the Oklahoma Natural Gas Company to every local distributing system to which it furnishes gas, and to be charged by the Oklahoma Natural Gas Company for gas at the city gates to each and every distributing system owned by the Oklahoma Natural Gas Company itself. Each and every distributing company which shall take gas from the Oklahoma Natural Gas Company, including both the independent distributing companies and those owned by the Oklahoma Natural Gas Company itself, shall receive and accept from the Oklahoma Natural Gas Company at the borders or boundaries of each town and city, and shall pay for the full amount of gas measured into the distributing system at the borders or boundaries of each town and city. * * *

"The said city gate rate is hereby fixed at the sum of 25 cents net per 1,000 cubic feet, to be measured at the borders or boundaries of each town and city; provided, however, that for the gas bought by the distributing companies and by them sold to patrons or customers using more than 500,000 cubic feet each month, the distributing companies shall pay to the Oklahoma Natural Gas Company only the sum of 20 cents net per 1,000 cubic feet for the gas used by each customer of each distributing company in excess of 500,000 cubic feet per month. * * *"

It is apparent that the commission disregarded both the evidence and its own findings in fixing this rate. The company not only complains of this action on the part of the commission, but insists that the commission excluded property owned by appellant used and useful in the conduct of its business of the value of $688,000, which sum should be added to the original cost of the property as found by the commission, and contends that if the commission had taken into consideration the reproduction cost of the property, the value of the production and transmission properties for rate-making purposes would approximate $18,000,000.

It is evident that the commission ignored entirely the reproduction cost of the property in arriving at its value, and that it failed to take into consideration the sum of $688,000 which appellant had invested in lands, buildings, and other property, being its regulator stations, warehouses, and material therein. This is property used and useful in the conduct of the business and should be included in the value of the property for rate-making purposes, and the reproduction cost of all of appellant's production and transmission property should have been taken into consideration in fixing a value upon which to base a rate. San Diego Land & Town Co. v. National City, supra; San Diego Land & Town Co. v. Jasper, supra; Willcox v. Consolidated Gas Company, supra; Des Moines Gas Co. v. City of Des Moines, 238 U. S. 153, 59 L. Ed. 1244; City of Knoxville v. Knoxville Water Co., 112 U. S. 1, 53 L. Ed. 371; The Minnesota Rate Cases, 230 U. S. 352, 57 L. Ed. 1511; Darnell v. Edwards, 244 U. S. 564, 61 L. Ed. 1317; Consolidated Gas Co. of N. Y. v. Newton, Atty. General, 207 Fed. 231; State of Missouri ex rel. Southwest Bell Tel. Co. v. Public Service Commission of Missouri (not yet officially reported, handed down by the Supreme Court of the United States, May 21, 1923).

The Corporation Commission insists that the record herein does not supply essential data upon which a proper valuation of the purely public utility properties of the appellant may be made or requisite data from which the purely public utility expenses may be determined as a predicate for the making of a permanent rate, and assigns as a reason for this contention that the properties of appellant devoted to the production of gas

as distinguished from the transmission and distribution properties and the expenses incident to the production as distinguished from the expenses for the transmission and distribution of gas are not public utility properties and expenses within the meaning of chapter 93, Sess. Laws 1913, which defines public utlities as follows:

"Section 1. The term 'public utility,' as used in this act, shall be taken to mean and include every corporation, association, company, individuals, their trustees, lessees, or receivers, successors or assigns, except cities, towns, or other bodies politic, that now or hereafter may own, operate, or manage any plant or equipment, or any part thereof, directly or indirectly, for public use, or may supply any commodity to be furnished to the public.

"(a) For the conveyance of gas by pipe line:

"(b) For the production, transmission, delivery or furnishing of heat or light with gas. * * *"

The commission argues that it is only the properties used and useful for the conveyance of gas by pipe line that are properly within the act; that a gas lease is not useful for the conveyance of gas, though necessary for its production, and that under the terms of the act a gas lease is not such property as should be taken into consideration in arriving at the value of appellant's property for rate-making purposes, and that the expenses of drilling gas wells and producing gas is not a proper charge.

This argument is rather peculiar in view of the commission's order, wherein it took into account the value of appellant's production property and the amount of its production expenses in fixing the city gate rate, and in view of the former holdings of the commission in Re Osage & Oklahoma Company et al., P. U. R. 1917-D, 426, and in Re Pawhuska Oil & Gas Company, P. U. R. 1917-D, 947, wherein it expressly held that both the value of the production property and the expenses of production must be taken into consideration in a rate valuation, and this is consonant with the uniform holding of the courts and commissions. In re Hope Natural Gas Co. (W. Va.) P. U. R. 1921-E. 418; Re United Fuel Gas Co. (W. Va.) P. U. R. 1920-C. 583; Clarksburg Light & Heat Co. v. Public Service Commission (Supreme Court of W. Va.) P. U. R. 1920-A. 639; Re United Fuel Gas Co. (W. Va.) P. U. R. 1918-C. 193; Re West Virginia Central Gas Co. (W. Va.) P. U. R. 1918-C. 453; Re Baker Natural Gas Utility (Mont.) P. U. R. 1921-C. 609; Re Kokomo Gas & Fuel Co. (Ind.) 1921-C. 390; Re West Virginia Central Gas Co. (W. Va.)

1921-D. 726; Re Peoples Natural Gas Co. (Ind.) P. U. R. 1920-F. 875; Re Southern Counties Gas Co. (Cal.) 1921-B. 705; Town of Amherst v. Snyder Gas Co. (N. Y.) P. U. R. 1921-D. 539; Iroquois Natural Gas Co. (N. Y.) P. U. R. 1919-D. 76.

We are unable to give to chapter 93, Sess. Laws 1913, the interpretation contended for by appellee. By the provisions of section 1 of the act, the term "public utility" shall be taken to mean and include every corporation which operates or manages any plant or equipment or any part thereof directly or indirectly for public use, or may supply any commodity to be furnished to the public "(a) for the conveyance of gas by pipe line, (b) for the production, transmission, delivery or furnishing of heat or light with gas."

It will be observed that the act merely defines a public utility. It does not undertake to enumerate the kinds and character of property to be considered in fixing a rate base. The appellant furnishes gas to the public and it supplies this gas with its production property as it conveys it with its transmission property; but appellee contends that clause "b" of section 1 of the act cannot apply to appellant because that relates to the production of light and heat with gas, not to the production of gas for the purpose of producing heat or light.

It is a cardinal rule that in the construction of statutes the legislative intent must govern, and to arrive at the legislative intent the entire act must be considered, together with all other enactments upon the same subject, and when the intention of the Legislature can be gathered from the entire statute, words may be modified, altered, or supplied to give the statute the force and effect which the Legislature intended (Territory v. Clark, 2 Okla. 82, 35 Pac. 882; Stiles v. City of Guthrie, 3 Okla. 26, 41 Pac. 383; Blevins v. Graham, 72 Oklahoma, 182 Pac. 247; Ledegar v. Bockoven, Co. Treas., 77 Okla. 58, 185 Pac. 1097); and as the purpose of construing a statute is to ascertain the legislative intent, the court may substitute or supply a necessary or proper word to attain this result (Trustees, Executors & Securities Ins. Corp. v. Hooton, 53 Okla. 530, 157 Pac. 293); also, where words have been erroneously used in a statute, and the context affords the means of correction, the proper words will be deemed substituted (Schaffer v. Board of Com'rs of Muskogee County, 33 Okla. 288, 124 Pac. 1069).

Bearing in mind these rules, and also bearing in mind that it is axiomatic that an interpretation of an act which will render it reasonable, just, and of some effect will be

adopted in preference to one which will render it unreasonable, unjust, or absurd, we are forced to the conclusion that the act in question was intended to apply to those who furnish directly or indirectly to the public gas for heat or light. To hold that the act applied only to those engaged in the production, transmission, delivery, or furnishing of heat or light with gas, as contended by appellee, would, in our opinion, be absurd, and the effect thereof would be to render that portion of the statute inoperative, as no utility in this state furnishes heat or light to the public with gas. All that such utilities furnish is gas with which to produce the heat or light, and it was to these that the Legislature intended the act to apply. It follows that the properties owned by appellant used and useful in the production of gas should be included in arriving at the value of its property, and the expense of producing its gas should be taken into account in establishing rates to be charged by it.

The commission next argues that it was justified in disregarding evidence of the replacement cost of the property for the reason that evidence of the replacement cost was based upon the price of labor and material as of January, 1920, whereas, the order was made on June 25, 1921, and there had been a continued price recession as well as a continued recession of current rates of return between the time at which the replacement cost figures were developed and the time of making the order.

As heretofore stated, the value of the property should be ascertained as of the time the inquiry is made, and evidence of its value 18 months prior thereto does not establish the value at the time of the inquiry, though such evidence might properly be considered together with other facts and circumstances in arriving at a fair value at the time of the inquiry, and as the appellant instituted this proceeding, it was incumbent upon it to establish the reproduction cost of its property at the time of the inquiry, and it cannot predicate error upon the commission's failure to find the replacement value of its property when it has failed to furnish sufficient evidence upon which to base such finding.

Many collateral questions are raised, and numerous arguments advanced thereon, which we do not deem it necessary to now discuss, but will confine ourselves merely to the determination of whether or not the rate established is just and reasonable under the evidence and the findings of the commission. We will, however, add to the value fixed by the commission the sum of $688,000, represented by the cost of appellant's regulator stations, warehouses, and warehouse material, which the record discloses the commission failed to include. This makes a total value of $17,232,950.23, as the original cost of the property, plus working capital and a going-concern value of 10 per cent.

The commission found the total annual expense of appellant to be $3,955,059.15, but now insists that many items of expense were improperly allowed, including federal income tax in the sum of $121,000, interest on the funded debt amounting to $76,887.92, and interest on notes payable of $10,958.19, which items it claims are manifestly improper under the holdings of the Supreme Court of the United States in Galveston Electric Co. v. City of Galveston, 66 L. Ed. 382.

We cannot interpret the language there used as indicating that a utility is not entitled to deduct income taxes paid. The court there said that in calculating whether a 5 cent fare would yield a proper return, it is necessary to deduct from gross revenue the expenses and charges, and all taxes which would be payable if a fair return was earned are appropriate deductions, and that there is no difference in this respect between state and federal tax, or between income taxes and others. The court did say, however, that the fact that it is a federal corporation tax for which deduction is made should be taken into consideration in determining what rate of return should be deemed fair, this for the reason that under the income tax act the stockholder is not required to include in his income on which the normal federal tax is payable dividends received from the corporation, and this tax exemption is, in effect, part of the return on the investment. It seems to us that the meaning of this language is that, inasmuch as the net income of the corporation is eventually distributed to the stockholders in the form of dividends, and as the stockholders are not required to pay income taxes on these dividends, this fact should be taken into consideration in determining whether the rate of return is fair. It is obvious that a lesser return which is exempt from the income tax would equal a larger return upon which such tax was payable, and it is this which the court said should be taken into consideration in determining whether the rate of return was reasonable.

In Municipal Gas Co. v. Public Service Corporation, 186 N. Y. Supp. 541, it was held that operating expenses of a gas company include federal income tax paid by the corporation; that such tax is a proper charge was also held in Consolidated Gas Co. of New York v. Newton, 267 Fed. 231; and we are in accord with those holdings.

In Municipal Gas Co. v. Public Service Corporation, 186 N. Y. Supp. 541, it was held that operating expenses of a gas company include federal income tax paid by the corporation; that such tax is a proper charge was also held in Consolidated Gas Co. of New York v. Newton, 267 Fed. 231; and we are in accord with those holdings.

The item of $76,887.92 interest on the funded debt should not have been allowed as an operating expense, but this should be paid from the return on the investment. This is in reality the cost of the money invested by appellant. The property paid for therewith went to make up the value of the property as found by the commission, and to allow appellant a return on the money invested, and also the interest paid on the bonds with which this money was procured, would be to impose upon the public a burden it should not carry. The money invested in the business must be treated as the appellant's, and if, instead of putting its own money into the enterprise, it sees fit to borrow the same, it, and not the public, must pay for the use thereof. The item of $10,958.19 interest on notes payable was likewise improperly allowed. If, as claimed, this money was borrowed to pay operating expenses, such operating expenses have been allowed, and the public should not be compelled to pay interest thereon because of appellant's inability to properly finance its operations.

It is next contended that the charge of $96,325.43 for canceled and surrendered leaseholds and the sum of $65,548.02 for abandoned wells and lines should not be charged as expense, but should properly be charged to the amortization account, as should also the item of $30,489.18 for abandoning lines.

Appellant answers this contention by asserting that the canceled and surrendered leaseholds and abandoned wells and lines amount to about the same each year, and if they were to be taken care of by an allowance for amortization, the sum allowed would have to be as large as it would to take care of them as expenses, and as the same amount of money would have to be earned each year, it is immaterial whether it be denominated amortization or expense.

The property represented by these items was, no doubt, included in the inventory, and went to make up the total value of the property as a basis for a rate, and it would be unjust to the consumer to permit the appellant to charge the value thereof to the expenses for the current year, for the purpose of arriving at the amount to be earned each year, but the same should be charged to amortization and taken care of out of the fund provided for that purpose.

It is next urged that the item of $525,654.-34 expended for drilling wells which is included in the total production expense should be excluded, because the testimony shows that this sum had already been included in the valuation of the property to obtain a rate base.

If this state of facts were shown to exist, appellant's position would be correct, but we do not understand the record to so show. As we view the record, it discloses that this sum was expended for labor, fuel, water, etc., in drilling operations alone, and this item is not included in the valuation of the property; that only the equipment in and about the wells was included in arriving at the value of the property. The commission found as a fact that this amount was a proper item of expense, and the Constitution clothes this finding with the presumption that it is prima facie correct. Section 22, art. 9, Constitution; Chicago, R. I. & P. Ry. Co. v. State, 24 Okla. 370, 103 Pac. 617; Missouri, K. & T. Ry. Co. v. State, 24 Okla. 331, 103 Pac. 613. Therefore, in the absence of a showing to the contrary, we will presume that the finding of the commission in this record is correct.

It is next contended that the tax item of $130,849.32, being the last half of the taxes for 1919, was improperly included as an expense. These taxes should not have been considered, for the reason that the taxes for the year 1920, amounting to $230,854.52, were included, and taxes for but one year should be included in determining the annual expenses. Therefore, the annual expenses charged should be reduced to $3,544,001.13.

The commission found that the company had paid the sum of $1,258,269.26 for gas during the year under consideration, and that practically all gas purchased had been paid for at 6 cents per 1,000 cubic feet, but that at the time of the inquiry the price of gas had increased and the company was compelled to pay 10 cents per 1,000 cubic feet for all gas purchased, and that at this price the company would be compelled to pay for the same quantity the sum of $2,077,115.40, and this item was allowed as an expense. The commission then found that the price of gas at the mouth of the well had declined until at the time of making the order it could be purchased for at least one-third less cost to the company. This latter finding is without evidence to support it. Indeed, the commission did not purport to base this finding on any evidence before it, but stated

that it had an independent knowledge of this fact, and in making the order did not take as conclusive the testimony with reference to the price of gas.

The commission should base it findings upon evidence before it. The rights of the parties depend upon facts established at the hearing, and not upon some independent knowledge of the commission· acquired after the hearing. There being no evidence to the effect that the price of gas at the mouth of the well had declined, but the evidence all being to the effect that at the time of the hearing the company was compelled to pay 10 cents per 1,000 cubic feet therefor, we must disregard this finding of the commission. A finding without evidence to support it is arbitrary and baseless. Interstate Commerce Commission v. Louisville & Nashville Ry. Co., 227 U. S. 88, 57 L. Ed. 431; see, also, Pioneer Tel. & Tel. Co. v. Westenhaver, supra.

We cannot determine from the record what amount the commission allowed for return on the investment or for depreciation and amortization. In fact, we are unable to understand in what manner the commission arrived at the rates fixed.

In determining what would be a fair return and a reasonable allowance for depreciation and amortization, it is proper to take into consideration the character of the business of the public utility, and in this connection it should be borne in mind that a natural gas public service business is generally more hazardous than the business of any other public utlity. The duration of the business is limited by nature, because the commodity in which the utility deals is supplied by nature alone. The supply is limited and is exhaustible, and when exhausted can never be recreated All that man can do is to find and furnish the supply that nature has created, and when this supply is exhausted the business of the utility is at an end. This is not true of any other public service business. Artificial gas companies, electric light companies, telephone and telegraph companies, and railroad and street railway companies create the basic element of their service; their business is stable and its duration is not limited. The only other public utility which deals in a commodity created by nature only is a water company, and its supply is constantly replenished by nature itself in the falling of rains and the melting of snows. An investment in any of these enterprises is not limited in its duration, but is permanent, and by competent and efficient management an investment therein will yield a permanent return and the company will earn in addition a sum

sufficient to take care of depreciation caused by ordinary wear and tear upon the property and replace wornout equipment, so that the investment is at all times stable. But this is not true of a natural gas utility. When the supply of gas is exhausted, the equipment is worthless except for the price it will bring as junk. A natural gas utility must continually seek additional supply; as new gas fields are discovered, it spends vast sums in extending its pipe lines to these new fields. This expenditure is not made for the purpose alone of increasing its business, but, of necessity, is made to supply those it is already under the duty of serving, and this expenditure is made with the knowledge that the gas in this field will soon be exhausted and when exhausted the pipe lines thereto serve no further useful purpose. This and many other elements entering into the business distinguish it from all others, rendering its operations more unstable and hazardous than the operation of any other public utility, and require the consideration of many elements in establishing a rate unnecessary to be considered where other utilities are concerned, one of these being the question of amortization.

It has been held that natural gas utilities should receive a higher rate of return than any other utility because of the relative short period for capital investment therein and the unusual hazards attending operations. Re Baker Natural Gas Co., P. U. R. 1921-E, 609. While we are not inclined to so hold, we do hold that a natural gas utility is entitled to earn a reasonable return, and a reasonable amount for depreciation and amortization, and this was not accorded the appellant.

A careful examination of the entire record, and a consideration of all the circumstances surrounding the appellant, lead us to the conclusion that a return of 8 per cent. per annum on the investment is reasonable and just.

The appellant insists that it should be entitled to earn 5 per cent. per annum for depreciation and 10 per cent. per annum for amortization, and the testimony of its witnesses was that depreciation and amortization would run from 12 to 15 per cent. per annum. This would. no doubt, be true, if the company had but recently started its business, but the witnesses evidently overlooked the fact that the company had been operating for several years and failed to take into consideration past earnings in order to arrive at a proper allowance for this purpose. In order to arrive at a rea-

sonable and just allowance for this purpose it is proper to take into consideration the age of the company and its fiscal history.

It appears that appellant was organized in 1907, with a capitalization of $4,000,000— $2,000,000 of this was paid in cash, and $2,000,000 was exchanged for properties. The appellant operated under this capitalization until 1917 when its capital stock was increased to $10,000,000; $1,356,000 of this was sold for cash, and the remainder of the increase was used to take over the properties of the Osage & Oklahoma Company, Caney River Gas Company, Peoples Fuel Supply Company, Enid Natural Gas Company, and Oklahoma Fuel Supply Company. Later, the capital stock was again increased, until there is now outstanding stock of the par value of $14,300,000, $1,-000,000 of which was issued as a bonus or stock dividend. Of the total amount of stock issued, $4,356,000 has been paid for in cash, and the remainder was issued for property and as stock dividends.

There is much evidence in the record to the effect that meager dividends have been paid by appellant, but we fail to find evidence showing the earnings which have been made, so it is impossible to arrive at exactly what should be charged by appellant for amortization. However, it is fair to presume that much of the property now owned by appellant has been acquired out of its earnings. It must be borne in mind that from 1907 to 1913, the Corporation Commission was without jurisdiction of appellant, and during this period it was operating under rates of its own making. Indeed, it continued to operate under such rates until 1918, when it for first time applied for an adjustment of rates.

It is not reasonable to suppose that appellant operated for 11 years at a loss, or that it failed to make provisions for depreciation and amortization. To the contrary, it is but reasonable to presume that during those years when it was operating unhampered by rate-making authority of the state, it allowed itself an adequate amount each year for these purposes.

We are not advised as to the probable duration of appellant's business or when its property will probably become obsolescent, but it would be manifestly unjust to charge those who consume the gas furnished by it hereafter with practically the entire cost of the property in addition to a reasonable return on the entire investment. These views find support in Clarksburg Light & Heat Co. v. Public Service Commission (W.

Va.) 100 S. E. 551. Under the circumstances, we conclude that an allowance of 10 per cent. for depreciation and amortization would not be unreasonable.

The commission found that the company sold during the year in question 20,289,294 M feet of gas. Of this amount 5,617,278 M feet were sold for field gas, drilling gas, and in the towns of Claremore, Ramona, and Inola, for which there was received $970,-423.31, and by deducting the amount sold as field gas, etc., from the total amount sold, leaves 14,672,016 M feet to be sold in cities and towns involved in this proceeding and by taking the sum of $17,232,950.23 as the value of the property and allowing 8 per cent., or $1,378,636.02 for return, and 10 per cent., or $1,723,295.02, for depreciation and amortization, and allowing the sum of $3,544,001.13 for expenses, we have a total to be earned of $6,645,932.17. From this amount should be deducted the sum of $970,423.31 received from the sale of field gas, drilling gas, and gas sold to the towns not involved herein, which would leave the sum of $5,675,508.86 to be earned from sales in the cities and towns here involved, and to earn this amount would require a rate of approximately 38 cents per 1,000 cubic feet at the city gates.

By adopting the same method above applied, and taking the sum of 38 cents per thousand cubic feet as the cost of gas at the city gates, and making due allowance for leakage in the distributing systems of appellant, we find a rate of 60 cents per 1,000 cubic feet for domestic gas and 25 cents per 1,000 cubic feet for industrial gas in the city of Tulsa, and the towns of Dawson, Red Fork, and Turley, and a rate of 63 cents per 1,000 cubic feet for domestic gas and 25 cents per 1,000 cubic feet for industrial gas in the other cities and towns served directly by appellant to be reasonable.

It follows that the order of the Corporation Commission should be reversed, and that in lieu of the rates therein fixed, a city gate rate of the sum of 38 cents per 1,000 cubic feet, to be measured at the gates of each town or city for domestic gas, and the sum of 20 cents per 1,000 cubic feet for industrial gas should be established, these rates to apply to the town of Carney, which takes gas from the lines of appellant, and to the Midfield Gas Company, which owns the distributing system in Oilton; the Southwestern Oklahoma Gas & Fuel Company, which owns the distributing systems in the cities of Duncan and Marlow, such rates

to be applicable in each city; to the Oklahoma Gas & Electric Company, which owns the distributing systems in Oklahoma City, El Reno, Yukon, and Britton, such rates to be applicable in each of such cities and towns; to the Muskogee Gas & Electric Company, which owns the distributing system in the city of Muskogee, to the Commonwealth Public Service Company and its receiver, which owns the distributing system in the city of Wagoner; to the Shawnee Gas & Electric Company, which owns the distributing system in the city of Shawnee, and to the Guthrie Gas, Light, Fuel & Improvement Company, which owns the distributing system in the city of Guthrie.

That a rate of 63 cents per 1,000 cubic feet for domestic gas and 25 cents per 1,000 cubic feet for industrial gas should be established in the towns of Arcadia, Chandler, Coweta, Depew, Davenport, Deer Creek, Edmond, Haskell, Kellyville, Lamont, Luther, Midlothian, Meeker, Nardin, Peckham, Pond Creek, Porter, Sapulpa, Shamrock, Stroud, and Wellston and a rate of 60 cents per 1,000 cubic feet for domestic gas and 25 cents per 1,000 cubic feet for industrial gas should be established in the city of Tulsa, and the towns of Dawson, Red Fork, and Turley, provided that the rates herein established for industrial gas shall not be available for quantities of less than 200,000 cubic feet used by one customer during one month, and provided that on bills not paid on or before the 10th day after presentation, an additional charge of 2 cents per 1,000 cubic feet may be made. That such rates shall remain in force until changed by order of the Corporation Commission in a proceeding instituted by any party affected hereby.

And it is so ordered.

KENNAMER, COCHRAN, HARRISON, and BRANSON, JJ., concur. McNEILL, J., dissenting.