## CONSUMERS GAS CO. v. CORPORATION COMMISSION.

## CITIES OF MIAMI, PICHER, COMMERCE, AND CARDIN v. SAME.

## In re Application of CONSUMERS GAS CO. for Increased Gas Rates.

No. 13352—Opinion Filed Sept. 18, 1923

(Syllabus.)

1. **Gas—Increase in Rates by Corporation Commission—Notice.**

Rate making being a legislative power, notice to parties affected by an order of the Corporation Commission increasing gas rates upon application of a public service corporation need not be given, unless specifically required by statute.

2. **Corporation Commission — Hearings — Waiver of Notice.**

If a party is entitled by statute to notice, in a particular manner, of a hearing before the Corporation Commission, such notice is waived by such party appearing and participating in the proceedings, without objection to the sufficiency of the notice given.

3. **Gas — Order Establishing Rates—Date Effective.**

Where the Corporation Commission on March 29, 1922, at the conclusion of a hearing for the purpose of establishing rates to be charged by a natural gas utility, announced that the rate was fixed at 63c per M cubic feet, to be effective April 1, 1922, but such order was not reduced to writing or dated until April 19, 1922, and recited that it was effective April 1, 1922, held, that the order was, in fact, made on March 29th, and the mere delay in reducing it to writing did not have the effect of rendering it retroactive, and inoperative prior to that time.

4. **Corporation Commission — Appeal from Rate Order—Suspending Bond.**

The Corporation Commission has the power to supersede its own order establishing a rate, pending an appeal to this court, by requiring of the party appealing, the suspending bond provided for by section 21, art. 9, of the Constitution.

5. **Corporations — Rate Regulation—State Powers.**

The power to regulate rates and charges for services rendered the public by a public service corporation is inherent in the state, and is a necessary attribute of sovereignty.

6. **Gas—Rate Regulation—Effect of Franchises and Contracts.**

The Legislature having delegated to the Corporation Commission the exclusive power of regulating rates for gas furnished by public utilities, the Corporation Commission may properly disregard the rates fixed by franchise, as well as those fixed by contract between the utility and individual consumers.

7. **Same—Rights of Utility—"Reasonable Rates."**

A natural gas utility is entitled to earn a reasonable return on its investment, and a reasonable amount for depreciation and amortization.

8. **Same — Order Fixing Inadequate Rate —Reversal.**

Where the Corporation Commission found that a public utility was entitled to earn a specified sum, but fixed a rate which would not produce such sum, the order fixing such rate will not be permitted to stand, but this court will establish such rate as will yield the income found necessary by the commission.

9. **Same.**

Record examined, and held, that the rate established by the Corporation Commission is unreasonable, and that the rate herein fixed should prevail.

Appeal from Corporation Commission.

Appeal by the Consumers Gas Company and the Cities of Miami, Picher, Commerce, and Cardin from an order of the Corporation Commission fixing gas rates to be charged by appellant. Order of the Corporation Commission reversed, and rate established.

Burford, Miley, Hoffman & Burford and Henshaw & Hough, for Consumers Gas Company.

F. W. Nesbitt, W. R. Chesnut, C. R. Weaver, A. L. Commons, and Joseph W. Howell, for the cities of Miami, Commerce, Cardin, and Picher.

NICHOLSON, J. This is an appeal from an order of the Corporation Commission, establishing rates to be charged by the Consumers Gas Company for natural gas furnished to consumers in the towns of Miami, Commerce, Cardin, and Picher.

It appears from the findings of fact and order of the Corporation Commission that in the month of August, 1920, the Consumers Gas Company filed its application with the commission to fix and authorize a rate to be charged for gas used for gas engines in the Miami district; that on October 1, 1920, after a hearing had, the commission made its order No. 1790, fixing a rate for gas engine purposes in said district at 35 cents per M cubic feet; on December 21, 1920, upon the petition of various consumers, both domestic and industrial, in the district, the cause was reopened and set for hearing; on January 4, 1921, and on different dates in February, 1921, all interested parties appearing before the commission, the hearing was proceeded with. In the meantime, the Consumers Gas Company amended its application and included therein a prayer for readjustment of rates for gas for all kinds of industrial use and domestic consumption in the towns and district served by it.

It is recited in said order that at these hearings much testimony was introduced by both the company and protestants; that it was disclosed by the testimony that the Consumers Gas Company produced none of the gas distributed by it, but purchased its entire supply from the Quapaw Gas Company, and one of the reasons for the amendment to the application so as to include a general readjustment of rates was based upon the fact that the matter of fixing a just and proper gas rate to be charged by the Quapaw Gas Company was, at the time, pending before the commission.

It is further recited that on July 1, 1921, the commission made order No. 1888, fixing the gate rate to be charged by the Quapaw Gas Company for all gas transported and delivered to distributing companies at 25 cents per M cubic feet for domestic gas, and 20 cents per M cubic feet for industrial gas. It is then recited in this order that:

"The commission, for the purpose of arriving at a fair value of the property of the Consumers Gas Company, will take as a basis the original cost as shown by the testimony, of $646,488.63, to which will be added for contingencies and overheads which were not included in that figure, 20

per cent. or $129,297.72, making a value of $775,785.72, and it is upon this basis and value that the company is entitled to earn a reasonable return and depreciation.

"The testimony upon the part of the company's witnesses shows that in the past 75 per cent. of the gas sold and distributed by it has been sold to industrial consumers, and that 25 per cent. of the gas sold and distributed has been used by domestic users. At the time of the hearing herein, a great many of the industrial consumers located in the mining districts in Ottawa county, were shut down—the testimony tending to show this shut-down to be temporary in its nature. It is shown that at the time of the hearing, approximately 50 per cent. of the gas sold and distributed was being used by domestic consumers and 50 per cent. by industrial users. It was also shown that during the year 1920, 2,069,556 cu. ft. of gas was sold by the company and that at the beginning of the year 1921, owing to the temporary decrease in the consumption upon the part of industrial users, approximately an equal amount of gas was being taken by domestic and industrial users or approximately 600,000 M cu. ft. for each purpose.

"The commission cannot believe that the company will sell less than 1,500,000 cu. ft. in the towns and cities served by it and to the industrial users of gas in the territories served by it, in the future. Taking that figure as a basis and dividing the amount equally as between industrial users and domestic users, allowing a rate of 25 cents for industrial consumption and 45c as the maximum rate for domestic consumption, would result in a gross return of $580,000. The operating expenses, as shown by the monthly reports for the year 1920, total for that year $495,871.17. There can be no doubt but that operating expenses for the present and coming years should be less, but taking this figure results in a net of $84,129 to the company as a return. Any increase in the industrial consumption of the mining fields of Ottawa county will result in an addition to these figures."

The commission then fixed a rate of 50 cents per M cubic feet for the first 150,000 cubic feet per month, 40 cents per M cubic feet for the next 350,000 cubic feet per month, 25 cents per M cubic feet for all in excess of 500,000 cubic feet per month, and 30 cents per M cubic feet for gas used for gas engines in excess of 500,000 cubic feet per month. Said order took effect from and after July 1, 1921.

On December 19, 1921, the Consumers Gas Company filed its application for a readjustment of rates, in which it was shown that it had operated under the rates

fixed by the order above mentioned for approximately six months, and as a result thereof had obtained an operating revenue of $15,071.78 during said period, applicable to return on the investment and depreciation charges; that the Quapaw Gas Company, from which it obtained its supply of gas, had made application to the commission for an increase in the price of gas; and prayed the commission to install a temporary rate sufficient to take care of any increase granted the Quapaw Gas Company, and also to afford the applicant a reasonable and adequate return upon the fair value of its property used and useful in the conduct of its business and to furnish an adequate depreciation charge on said property. Upon this application a hearing was had, and the commission made its order No. 2051, that portion of which it is necessary to notice reading as follows:

"After a conference attended by representatives of the towns involved in this order, the applicant and the Corporation Commission, which conference was followed by mass meeting of citizens of said towns, the Corporation Commission was notified by telegram that the people of the cities and towns involved in this order would not use gas at a rate higher than 63 cents per M cubic feet.

"In the hearing December 31, 1921, the applicant offered the original cost valuation as found in order No. 1895, which was $775,785.72, as a basis for a further adjustment of the rate. While the commission does not have a segregation of the property of the applicant in the towns of Miami, Picher, Commerce, and Cardin as compared with the company's property as a whole, it has a statement from the company showing that during the year ending November 30, 1921, it sold 480,800 M cu. ft. of gas for domestic purposes on its system, of which 321,434 M cu. ft., or approximately 66 per cent., was sold in the towns involved in this case, and this figure will be useful in finally determining the rate which should apply to domestic gas sales in said towns.

"Interest and depreciation charges against the property of the company as a whole on the valuation as found in order No. 1895 will be $100,852.14, being 8 per cent. return and 5 per cent. depreciation. The cost of gas for the coming year based on actual sales for 1921, for the entire distribution territory supplied by this company, will be $383,702.85. Expenses of distribution, maintenance, and taxes, according to the company's exhibit No. 1 in the record, will be $95,324.20, which shows the total revenue necessary to be derived from all sources to be $579,879.19.

"Based on the experience of the year ending November. 30, 1921, the company may expect to receive from industrial sales for the coming year, $243,752.12, which leaves to be supplied by domestic sales the amount of $336,127.07.

"As indicated above, the experience of the past year indicates that two-thirds of the total domestic sales of the company occurred in the four towns involved in this order. On this apportionment of the revenue necessary to be derived from domestic sales, these towns should yield, the coming year; $224,084.72. At a 63 cent rate for domestic gas the same volume of business as recorded in 1921 would yield $202,504.05.

"In view of the declaration of the representatives of the city of Miami, assuming to speak for themselves and the other cities involved in this order, who stated in open court that these cities would not pay a substantial increase, and who advised the commission by wire later that 63c per M cu. ft. was the rate which the citizens had agreed upon as a maximum, the commission is convinced that an order authorizing a rate in excess of 63 cents per M cu. ft. would result in a serious curtailment of the use of gas for fuel in the cities and towns involved in this order. Other fuel is more readily available in this particular locality than in most sections in Oklahoma where natural gas is used, and the commission does not wish to be in the position of knowingly establishing rates which it has reason to believe will work to the disadvantage of both the public utility and the consumer. The order of the commission under the economic conditions existing in the towns involved in this order, and other conditions brought to the attention of the commission as existing in connection with this case, will be, in this instance, such rate as appears the 'traffic' will bear" —and established the rate of 63 cents per M cubic feet for the first 150,000 cubic feet per month, 53 cents per M for the next 350,000 cubic feet per month, and 25 cents for all gas used in excess of 500,000 cubic feet per month for general industrial purposes, and 30 cents per M cubic feet all in excess of 500,000 cubic feet per month used for gas engine purposes, such rate to be effective as of and from April 1, 1922. This order was dated the 19th day of April, 1922. Afterwards, and on May 13, 1922, the commission made an order supplementing order No. 2051, which reads in part, as follows:

"On December 22, 1921, the Quapaw Gas Company filed its application for an increase in said gate rate to such a rate as to 'produce such adequate return as to pay all operating expenses, depreciation and a

return upon the fair value of the property.' Pending the hearing of the application of the Quapaw Company, all the distributing companies served by said Quapaw Gas Company filed application to increase their distributing rates to the consumers in the event the commission authorized an increase in the pipe line rates.

"At the conclusion of the hearing, and the promulgation of the order fixing or prescribing a 35c gate rate for the Quapaw Gas Company, which increased the former 10c per thousand cubic feet, and which resulted in an increase to the consumers, after allowing for shrinkage, etc., of 13c per thousand cubic feet, the commission announced and informed the representatives of the distributing companies of the various cities and towns served by the Quapaw, and the representatives of the consumers in said towns, that the distributing rate in each of said towns **would be increased** not less than 13c per thousand cubic feet, and that said increases would be effective on April 1, the date fixed for the increase in the rate for the Quapaw Gas Pipe Line Company.

"Before the commission had prepared and filed a journal entry or order, the commission was invited by certain of the cities and towns to hold a meeting in said towns for the purpose of discussing a new form of rate to be promulgated and tried out if the people so desired. A member of the commission attended said meeting and was at Miami on the 29th day of March, 1922, where a meeting was held, where the towns and communities served by the Consumers Gas Company were represented. Said towns consisted of Miami, Commerce, Cardin and Picher. At said meeting the various representatives and citizens were informed that unless the citizens desired the new form of rate the rate would be not less than 63c per thousand cubic feet flat rate, effective on April 1, 1922, and that the new form of rate, if agreed on and requested by the citizens, would also be effective April 1, 1922.

"It was decided at said meeting for the said towns to have a meeting and appoint a committee and to advise the commission through this committee as to which form of rate they preferred."

"As a result of such action, the commission was later advised through said committee that as between the new form of rate and the increased rate to 63c per thousand cubic feet, that the people in said towns preferred the 63c rate.

"Therefore, to wit, on April 19, 1922, order No. 2051 was promulgated by the commission as previously announced, prescribing a rate of 63c per M cubic feet, effective as of April 1, 1922."

From order No. 2051, and said supplemental order, the Consumers Gas Company and the cities of Miami, Picher, Commerce, and Cardin have appealed. Upon application of the gas company to supersede order No. 2051, the commission on April 24, 1922, made an order superseding order No. 2051, by which supersedeas order the company was permitted to collect the sum of 73c per M cu. ft. for gas pending the appeal, but was required to keep full and complete account of all collections in excess of the rates authorized in order No. 2051, and to deposit each month in local banks an amount equal to the excess collections made under authority of the supersedeas, such excess collections to be subject to withdrawal from the depositories by the persons entitled thereto upon order of the commission, if the order appealed from be affirmed, and which order required a suspending bond in the sum of $1,000, conditional as required by law.

The cities complain of the action of the commission in issuing the orders of April 19th and 24, 1922, without sufficient notice and opportunity to be heard. We fail to perceive any merit in this contention. Rate making being a legislative power, notice to the parties affected by an order of the Corporation Commission, increasing gas rates, upon application of a public service corporation, need not be given unless specifically required by the statute. City of Bartlesville v. Corporation Commission, 82 Okla. 160, 199 Pac. 396, and cases there cited. Our attention has not been called to any statute requiring notice to be given in a case of this character. Furthermore, the record discloses that each of the cities appeared at and participated in the hearing by counsel without objection to the sufficiency of the notice to them, and without any suggestion to the commission of their unpreparedness to proceed with the hearing. This constituted a waiver of notice, if any was required. City of Bartlesville v. Corporation Commission, supra.

It is next urged that the orders of April 19th and 24, 1922, were made to take effect retroactively as of April 1, 1922, and to that extent the Corporation Commission exceeded its powers, thereby rendering such orders void as to any period prior to their **dates.**

If order No. 2051 was not actually made until the date it bears, it would be inef-

fective prior to its date, for by section 23 of article 9 of the Constitution, it is provided that no order of the commission prescribing or altering rates shall be retroactive, but the supplemental order, above set out, shows that at the conclusion of the hearing, and at the time of the promulgation of the order fixing the 35 cent gate rate for the Quapaw Gas Company, the commission announced and informed the parties to this appeal that the rate to be charged in the cities complaining would be increased 13 cents per M cubic feet, and that said increase would be effective on April 1, 1922; that before the commission had prepared and filed a journal entry or order, it was invited by the citizens of such cities and towns to hold a meeting therein, for the purpose of discussing a new form of rate to be promulgated and tried out if the people so desired. Accordingly, a member of the commission attended a meeting at Miami, on March 29, 1922, at which meeting the cities of Miami, Commerce, Cardin, and Picher were represented, and at which time the residents and citizens of said cities were informed that unless they desired the new form of rates there proposed, the rate would be not less than 63 cents per M cubic feet after April 1, 1922; that the commission was later advised that said cities preferred the increased rate of 63 cents to the proposed rate, and that the commission on April 19, 1922, prepared and filed order No. 2051, prescribing the rate previously announced. Under these circumstances, we cannot say that the order was retroactive. It was in fact made prior to April 1st, and the parties knew that it was to become effective on that date. Had the commission dated its order back to April 1st, no valid objection could have been made thereto, and the mere fact that the commission reduced to writing, and dated the order on April 19th, will not render it inoperative prior to that time.

The cities next insist that the power to supersede the order of the Corporation Commission is vested in the Supreme Court, and the attempt of the Corporation Commission to supersede its order of April 19, 1922, was beyond the scope of its powers, and hence, a nullity.

This contention is based upon section 21, art. 9, of the Constitution, which provides, in substance, that upon the granting of an appeal, a writ of supersedeas

may be awarded by the Supreme Court suspending the operation of the action appealed from until the final disposition of the appeal, but prior to the final reversal thereof by the Supreme Court no action of the commission prescribing or effecting rates shall be delayed or suspended in its operation by reason of such appeal until a suspending bond shall first have been executed and filed with, and approved by the commission (or approved on review by the Supreme Court), payable to the state and conditioned as by said section required.

It is contended by the cities that under this provision the Supreme Court alone has power to supersede the orders of the commission. It will be observed that this constitutional provision is permissive merely, and contains no limitation upon the power of the commission. Section 20, of art. 9, of the Constitution provides that:

"* * * Until otherwise provided by law such appeal shall be taken in the manner in which appeals may be taken to the Supreme Court from the district courts, except that such appeal shall be of right. * * *"

The district courts have the undoubted right to supersede their own judgments, and while the practice in this regard is regulated by statute, yet, as a general rule, a court has authority under its general power to supersede its own executions in a proper case, especially where it has general jurisdiction of the subject. 37 Cyc. 599. The Corporation Commission had jurisdiction to make order No. 2051, and no good reason appears why it had not the power to supersede such order pending an appeal. In Wells Fargo & Co. Express et al. v. State, 45 Okla. 115, 144 Pac. 1021, the Corporation Commission issued a supersedeas order suspending its general order No. 203, pending a final determination thereof on appeal to this court, and later made an order requiring the express companies to give additional supersedeas bonds. This court sustained the right of the commission to require such additional bonds, and in doing so necessarily recogniz-

ed the power of the commission to supersede its orders. We conclude that the commission has the power to supersede its own orders by requiring the suspending bond provided for by section 21, art. 9, of the Constitution, and as by the supersedeas order in this case the company is required to keep all sums collected in excess of the rate fixed by the order on deposit, subject to withdrawal by the person entitled thereto, upon order of the commission, if said order be affirmed by this court, and in addition thereto was required to give the suspending bond provided for by said order, this was sufficient. Of course, if the commission should refuse to supersede its order, this court would, in a proper case, grant a supersedeas.

The next objection urged is that the record, as considered, did not include the franchise entered into between the city of Miami and the Consumers Gas Company in the year 1909, for a period of 25 years, nor did it include the private contracts between individuals in Miami, Picher, Commerce, and Cardin and the company for the purchase of gas, or the sums invested on the strength of such contracts.

The record before us, as certified by the commission, does not make any reference to the franchise or contracts mentioned, but by stipulation of the parties, a copy of said franchise has been filed in this court for our consideration, and by reference to section 9 thereof we find that the rate thereby agreed to be charged the city of Miami and the inhabitants thereof for gas for domestic consumption was 25 cents per M cubic feet.

By reference to the 11th Annual Report of the Corporation Commission, at page 303, we find that on January 29, 1918, the commission issued order No. 1372, by which it set aside the foregoing provision of said franchise, and fixed the rate at 35 cents per M cubic feet for domestic gas in Miami. The franchise was pleaded in that proceeding, but no appeal was taken from the order made. The record contains a

copy of order No. 1895 of date July 2, 1921, which established a rate of 50 cents per M cubic feet in the cities here complaining; that order was made after a full hearing and the cities were evidently satisfied with the rate there fixed, as the order was not appealed from, but became final.

The power to establish and regulate rates and charges for services rendered the public by a public service corporation is inherent in the state, and is a necessary attribute of sovereignty, and the Legislature having delegated to the Corporation Commission the exclusive power of regulating rates to be charged for gas furnished by public utilities, it follows that such commission had the power to disregard the rate fixed by such franchise, as well as those fixed by contract between the utility and the individual consumer. City of Pawhuska v. Pawhuska Oil & Gas Co., 64 Okla. 214, 166 Pac. 1058; City of Bartlesville v. Corporation Commission, supra; Southern Oil Corporation v. Yale Natural Gas Co., 89 Okla. 119, 214 Pac. 131. Therefore, we are unable to see the necessity for either the commission or this court considering the terms of the franchise granted by the city of Miami, or the contracts between the Consumers Gas Company and the individual consumers, in arriving at a rate to be charged by the company, as the rates mentioned therein have long since been declared inadequate by the rate-making authority of the state.

The cities next complain because the record discloses only the testimony taken at the hearing of December 31, 1921, and insist that the cause be remanded so that they may offer in evidence the records in the various hearings had before that time, but no excuse is offered for their failure to introduce these records at the hearing.

The decisions of the commission in those cases became final and if the evidence there introduced would have been competent, we fail to see that it would have been of any practical benefit to either the commission or this court in this case.

Various other arguments are advanced by the cities, many of which find no support in the record, and none of which it is necessary to here consider.

We now come to the consideration of the complaint of the Consumers Gas Company, which is that the rate established by the order of the Corporation Commission appealed from is unjust, noncompensatory, and invalid upon its face.

It appears by the order of July 1, 1921, that the commission found the value of the property of the Consumers Gas Company to be $775,785.72, which included 20 per cent. for contingencies and overheads, and that the actual operating expenses of the company, aside from the cost of gas purchased by it for the year ending November 30, 1921, was $95,324.20: it further found that interest and depreciation charges against the property of the company on the valuation found in order No. 1895, would amount to $100,852.14, being 8 per cent. for return and 5 per cent. for depreciation; that the cost of gas for the coming year, based on actual sales for 1921, would amount to $383,702.85, which shows the total revenue to be derived from all sources to be $579,879.19. The commission found that during the year 1920 the company sold 2,069,556 M cubic feet of gas; that at the beginning of the year 1921, owing to the temporary decrease in the consumption upon the part of the industrial users, the same had decreased until the sales amounted to approximately 1,200,000 M cubic feet, and that approximately one-half thereof was sold to industrial users, and one-half for domestic purposes. The commission then estimated that the company would sell at least 1,500,000 M cubic feet in the towns and cities served by it in the future, and on that basis would earn a net income of $84,129, and thereupon, in promulgating order No. 1895, fixed the rate for domestic purposes at 50 cents per M cubic feet. The company operated under this rate for the months of July, August, September, October, November, and December, 1921, whereupon it applied for a readjustment of rates, and at hearing showed that the earnings under the new rate for the six months period were $15,071.58 instead of $42,064.50, one-half of the amount estimated by the commission for the year. It further showed that for the year 1921, taking the old rate up until the time it was changed and the new rate for the remainder of the year, it sustained a loss of $24,541.58. It further showed that it actually sold but 1,215,883 M cubic feet

of gas, instead of 1,500,000 M cubic feet estimated by the commission it would sell, and over one-half of this was sold before the increased rate went into effect. This evidence was undisputed, and shows that the company sold 285,000 M cubic feet, or 19 per cent., less than the commission estimated would be sold. The commission found that during the year ending November 30, 1921, the company sold 480,800 M cubic feet of gas for domestic purposes on its system, of which 321,434 M cubic feet, or approximately 66 per cent., was sold in the towns here involved; that based upon the experience of the year ending November 30, 1921, the company should receive from industrial sales for the subsequent year the sum of $243,752.12, and for sales from domestic use the sum of $336,127.07, and as indicated two-thirds of the total domestic sales occurred in the cities here involved, the revenue derived from the sales in these cities should amount to $224,084.72; that at the rate of 63 cents per M cubic feet for domestic gas the same volume of business as recorded in 1921 would yield an income of $202,504.05.

It will be observed that this finding of the commission shows that a rate of 63 cents per M cubic feet would yield a revenue from the cities involved of $21,580.69 less than it found the company was entitled to earn.

It is apparent that the commission did not base the rate established solely upon facts found by it, but stated in its order that it established "such rate as it appears that the 'traffic' will bear." The commission was, no doubt, influenced to a great extent by the attitude of the inhabitants of the cities involved, who, through their representatives, stated in open court that these cities would not pay a substantial increase and who advised the commission by wire, later, that 63 cents per M cubic feet was the rate which the citizens had agreed upon as a maximum, and accordingly this was the rate fixed as being such rate as the "traffic" would bear.

We are not unmindful of the difficulties encountered in establishing a rate that would prove satisfactory to both the company and the consumer. It is but human nature to object to an increase in the price of a commodity we are required to purchase, or a decrease in the price of one we have to sell, so that the rate-making power is confronted with a delicate and ungracious task, and one that cannot be performed to the satisfaction of both the public and the utility, if, indeed, to the satis-

faction of either, hence, it devolves upon the courts to disregard the persuasive eloquence of the utility, and the ultimatum of the consumer, and base their decisions solely upon the facts and the law, as found to be. There is no rule of law more firmly established than that a public utility is entitled to earn a reasonable return upon its investment, and a reasonable amount for depreciation, and if it be a natural gas utility, a reasonable amount for amortization. Oklahoma Natural Gas Co. v. Corporation Commission, 90 Okla. 84, 216 Pac. 917, and cases there cited.

In the case at bar, the commission found that the Consumers Gas Company was entitled to earn 8 per cent. for return on the investment and 5 per cent. for depreciation, amounting to $100,852.14; that at the increased rate for gas at the city gates, it would be compelled to pay for gas purchased by it, based on the sales for the previous year, $383,702.85, and that its expenses for operation and maintenance would amount to $95,324.20, making a total required to be earned of $579,879.19. It is obvious that the rate fixed will not yield that amount, but that a rate of 70 cents per M cubic feet would be required to produce this sum. and this makes no allowance for amortization, because that question was not presented to or considered by the commission, neither is any allowance made for the probable decrease in the volume of gas sold, for the reason that we have no facts before us upon which to base an estimate of such probable decrease, though the commission found that experience had shown that a rate of 60 cents or more per M cubic feet will materially restrict the use of gas for heating purposes.

From a careful consideration of the entire record, we conclude that that part of the order of the Corporation Commission establishing a rate of 63 cents per M cubic feet for gas for domestic purposes should be reversed, and in lieu thereof a rate of 70 cents per M cubic feet for gas for domestic purposes should be established in the towns here involved, and it is so ordered.

JOHNSON, C. J., and KENNAMER, COCHRAN, BRANSON, and HARRISON, JJ., concur.