CITY OF OKLAHOMA CITY v. OKLAHOMA CORPORATION COMMISSION
2024 OK 77
Case Number: 120707
Decided: 11/06/2024
As Corrected: November 7, 2024
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2024 OK 77, __ P.3d __

 

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 
 

 

THE CITY OF OKLAHOMA CITY, Plaintiff/Appellant,
v.
OKLAHOMA CORPORATION COMMISSION, Defendant/Appellee.

APPEAL FROM OKLAHOMA CORPORATION COMMISSION

¶0 Corporation Commission issued an order preventing certain utilities from billing customers for certain municipal franchise fees and municipal gross receipts taxes by application of the February 2021 Regulated Utility Consumer Protection Act. The City of Oklahoma City appealed. The appeal was retained sua sponte by the Court for appellate review. The Corporation Commission filed a motion to dismiss. The motion to dismiss was previously denied by the Court. We hold: The Oklahoma Municipal League possesses standing in the controversy; and the Commission's determination that the February 2021 Regulated Utility Consumer Protection Act changed, amended, or altered a utility's legal obligations concerning municipal franchise fees and gross receipts taxes is a determination not sustained by law and must be reversed.

CORPORATION COMMISSION ORDER NO. 727704 REVERSED

Kenneth Jordan, Laura K. McDevitt, and Jerod A. Beatty, Oklahoma City, Oklahoma, for Appellant City of Oklahoma City
Niles Stuck, A New Energy, LLC, Oklahoma City, Oklahoma, for appellant City of Oklahoma City
Patricia L. Franz, General Counsel, and Daniel P. Boyle, Deputy General Counsel, Oklahoma Corporation Commission, Oklahoma City, Oklahoma, for Appellee, Oklahoma Corporation Commission
Curtis M. Long, J. Dillon Curran, and Anna H. McNeil, Connor & Winters, LLP, Oklahoma City, Oklahoma, for Summit Utilities Oklahoma, Inc.
Daniel McClure and Christian Rinehart, Oklahoma City, Oklahoma, for Oklahoma Municipal League

EDMONDSON, J.
¶1 This appeal involves an order of the Oklahoma Corporation Commission (Commission). The Public Utilities Division of the Commission (PUD) filed an application for the Commission to prevent named regulated utilities from billing customers for any franchise fees, municipal fees or taxes, and/or 68 O.S. §260174 O.S. §9070-§9081
¶2 We conclude that the Oklahoma Municipal League possesses standing in the controversy. The Commission decided extraordinary 2022 winter storm fuel costs that were subject to municipal franchise fees and municipal gross receipts taxes at the time of the winter storm would not be collected by utilities from customers due to application of the February 2021 Regulated Utility Consumer Protection Act. The effect of the Commission's order made these franchise fees and taxes related to extraordinary fuel costs to be unlawful for the purpose of Commission approved utility tariffs because of the Act. We also conclude the Commission's determination that the February 2021 Regulated Utility Consumer Protection Act changed, amended, or altered a utility's legal obligations concerning municipal franchise fees and gross receipts taxes is a determination not sustained by law and must be reversed.
I. Summary of Corporation Commission Proceeding and Final Order
¶3 The PUD's application was filed July 28, 2022. The same day the PUD also filed motions for oral argument on its application and to advance the date of the argument. The PUD gave notice of its filings to the Office of the Oklahoma Attorney General, Oklahoma Natural Gas (ONG), Oklahoma Gas & Electric (OG&E), Public Service Company of Oklahoma (PSO), and Summit Utilities, Oklahoma, Inc. (Summit). Oklahoma Natural Gas (ONG) and the Oklahoma Municipal League (OML) filed public comments in response to the PUD's application. OML also filed a request to intervene in the proceeding. OML requested a hearing and proceedings before an administrative law judge prior to the matter being decided by the Commissioners.
¶4 The PUD, the individual utilities, and the OML filed briefs. A hearing was held before the Commission on August 11, 2022. Counsel appeared for the individual utilities, OML, and the Office of the Oklahoma Attorney General. OML's motion to intervene was granted at the hearing. No evidence was introduced and the hearing consisted entirely of argument by counsel. The Commission took the PUD's application under advisement for a ruling at a later date.
¶5 The PUD's brief includes an attached letter from the Office of the General Counsel for the Oklahoma Tax Commission. The letter was a response by the Tax Commission to a request from OG&E and PSO concerning sales tax related to the February 2021 Regulated Utility Consumer Protection Act.
¶6 The Tax Commission's letter commented on the jurisdiction of the Corporation Commission and stated it is "required to review the qualified costs of the utility and determine whether the amounts incurred would otherwise be recoverable from customers as fair, just, and reasonable expenses and prudently incurred." O.R. at 165. The Tax Commission explained: "Pursuant to the Financing Orders and the Act, the utilities will charge customers under a [Corporation] Commission-approved tariff on behalf of the ODFA [Oklahoma Department of Finance Authority] and remit those receipts to the ODFA for payment of the Bonds." O.R. 165-166. The Tax Commission concluded: "The payment of the charge by customers does not constitute consideration received by a utility from the sale of electricity or natural gas because amounts received from the charge are received by ODFA and merely collected by the utilities acting as agent for ODFA." O.R. at 166.
¶7 The Tax Commission relied upon Oklahoma Administrative Code (O.A.C.) § 710:65-19-2-34(e), stating: "[c]harges which are separately stated and are unrelated to the amount of gas or electricity used such as fees for meter reading, installation, initiation, disconnection, or restoration of service, as well as charges for returned checks or for late payment, are not subject to sales tax." O.R. at 167. The Tax Commission noted the tariffs "while based roughly on a customer's monthly consumption of gas and electricity, are separately stated charges paid by ratepayers pursuant to the Final Financing Orders . . . . [and] [a]ccording to the Final Financing Orders of the Utilities, the relation to the amount of gas or electricity used is only so far as to provide a general reference for the fair assessment and equalization of tariffs between customers across districts." Id.
¶8 The Tax Commission concluded "securitization property" is a "right to payment" and not collected for the sale of gas or electricity, and "unrelated to the amount of gas or electricity used" and "as such the collection of the tariff charges [for securitization property] are not subject to sales tax. Id. O.R. at 167. The unrelatedness referenced by the Tax Commission is based upon conclusions: (1) The actual gas and electricity used by, and sold to, a particular customer is not an actual measured amount that may be used for the "securitization payment" that is billed to the particular customer; and (2) This securitization payment is not a sale for the purpose of a "sales tax." The Tax Commission's letter did not address municipal franchise fees or a municipal gross receipts tax or how these fees and taxes relate to the actual gas and electricity sold to customers and attributed to the 2021 severe winter event.
¶9 The brief filed by ONG included an attached Final Financing Order for ONG issued by the Corporation Commission pursuant to the February 2021 Regulated Utility Consumer Protection Act. O.R. at 239-320 (including appendices, attachments, and opinion of dissenting Commissioner). This order is attached for the purpose of explaining the fuel costs associated with the winter storm were paid by ratepayer-backed bonds and not by the usual billing procedure. A finance order determines a "mechanism under which the regulated utility will recover from customers an amount necessary to service, repay and administer the ratepayer-backed bonds . . . [and a] customer's monthly billing charges collected pursuant to the nonbypassable mechanism established under a financing order shall be based upon the then-current monthly billing of the customer." 74 O.S. 2021 § 9074
¶10 ONG's Order states commencement of a proceeding on April 29, 2021, by filing an application for a Financing Order. This Order was issued by the Commission in January 2022. In re Application of Oklahoma Development Finance Authority For Approval of $1,450,000,000 Ratepayer-Backed Bonds, 2022 OK 47511 P.3d 1052
¶11 Representatives from utilities explained municipal franchise fees were not billed to customers for franchise fees associated with the portion of unusual fuel costs during the February 2021 winter weather event. A representative for ONG stated it charged customers franchise fees upon fuel costs that were based upon "a typical amount [that] would have been outside of the storm, and they were charged at that fuel amount." O.R. at 46. A representative for PSO also clarified that franchise fees were paid for the previous customary amounts for this period of time by using a "normalization process for fuel" calculation of franchise fees. Summit explained that Its "predecessor in interest, Centerpoint engaged in a normalization effort . . . and the franchise fees were paid on those ordinary costs." Id. O.R. at 50-51.
¶12 The PUD explained its position in support of its application with the following testimony and argument concerning payments made by utility customers to service debt created by these rate-payer backed bonds.
[T]he utility company is merely a servicer of the debt . . . all the utility does is routine billing, collection and reporting duties on behalf of the authority who is the owner of the securitization property.
Funds collected are paid over to the ODFA and the State Treasurer and then deposit those funds into a special fund with a bond trustee for servicing the bonds. And as compensation for his role as an initial servicer, the utility is entitled to earn a servicing fee payable out of the monthly tariff charge collected from the customers.
Additionally, the Oklahoma Tax Commission rulings . . . state that the collection of separately stated charges under the OG&E and PSO tariffs on behalf of the ODFA for servicing taxpayer bonds, are not subject to Oklahoma sales tax, and that is further evidence that the utilities are merely servicers of the debt . . .
[T]he cost of securitization property is a right to payment. It is collected by the --- it is not collected by the utilities in exchange for the sale of natural gas or electricity, and is therefor, unrelated to the amount of gas or electricity used.
The Act, as well as the financing orders clearly limit any collection and billing by the regulated utility to only those items set forth in each utility's respective, irrevocable and non-bypassable mechanism. And that does not include franchise fees, municipal fees or taxes or gross receipt sales taxes.
. . . Franchise fees were paid during the event, but because utilities keeps [sic] on file a regulatory asset, those fuel costs were pulled out of those bills. And as a result, franchise fees were not paid on those [extraordinary] fuel costs.
Hearing Tr. Aug. 11, 2022, O.R. at 37-40 (explanation added). The PUD explained, a Commissioner agreed, that fuel extraordinary fuel costs due to the winter storm had never been approved as a fuel cost to be collected from a customer.
¶13 One Commissioner opined franchise fees are tied to, or contingent upon, fuel costs approved by the Commission for ratepayer payment.
I think for the most part, the franchise agreements are specific, that it has to be a charge passed along to the ratepayer by the utility that has been approved by the Commission. In this case, there was never a Fuel Adjustment Clause, which would have been the normal process in that. So the utilities we never authorized the utilities to collect that fuel cost until we took it out and put it over into a securitization bucket, at which time it's no longer the property of the utilities.
. . . [O]ur role is to authorize the utilities or not authorize the utilities for collection from the ratepayers. In this case, we never authorized the utilities to collect those fuel costs because that never even became an issue because we went a different direction and we placed it into a securitization bucket, which the utility at that time, it's no longer the property of the utility.
Hearing Transcript, O.R. at 60-61. A different Commissioner noted this approach raised an important issue: "Is the obligation to pay for fuel the day it was consumed, the day that it was purchased from some past supplier, the day that it might have got billed later to the customer?" Id. O.R. at 62.
¶14 OML argued if a municipality improperly assessed "some huge finance -- franchise fee" and a utility objected, then "[t]hey need to take that to District Court . . . [because] whether or not that is in accordance with the agreement in Oklahoma is not within the jurisdiction of this Commission to determine." Hearing Transcript, O.R. at 67. OML argued the essence of the PUD's application was a request for the Commission to "decide which part of those franchise fees are properly assessed." Id. O.R. at 69. OML stated franchise fees are set by a contract, i.e., the terms of the franchise agreement between a municipal government and the utility provider. Further, "fuel costs were subject to the franchise fees that were in place at the time of the winter storm." Id. at 55. However, the terms of the many municipal agreements are not uniform. OML explained the following.
So in this particular incident there are hundreds, if not thousands, of [franchise] agreements [in effect at the time of the winter storm]. I can't speak to a thousand different agreements and what those individual terms were. So I can't tell you specifically this one said all revenue versus only fuel cost or a percentage of this or that.
Hearing Transcript, at 56. OML concluded with the point concerning the authority of the Commission: "[t]he whole concept of this body here determining when a franchise fee applies and when it doesn't is a new and novel approach." Id. O.R. at 60. OML further noted variations in franchise agreements between municipalities and utilities, and municipalities "then bill the fee to utilities."
"[W]e've got tons and tons of agreements. There is no way that anyone can sit there and tell you what they all say.
As I understand the way these franchise fee assessments go about, are that the municipalities review those agreements . . . that they assess the fee and then bill the fee to the utilities.
Of course that fee is subject to their tariffs. And the passing of that fee to the customer has been approved, to my knowledge, in every tariff at issue in this case.
Hearing Transcript, O.R. at 64. OML stated the franchise fees are part of a tariff in the sense that the fee is billed to the customer by a utility, but argued these franchise fees are not subject to being altered by the Commission, unlike a tariff being created by the exercise of a legislative power possessed by the Commission. OML also argued the Commission "cannot change the obligation of the municipalities to assess the franchise fee in accordance with the franchise agreement." Id. O.R. at 73. OML stated franchise fees are owed by the utility to a municipality based upon the utility's sale of fuel regardless of the Commission including the fee in a tariff based upon a fuel assessment cost or a securitized revenue cost. Id. O.R. at 72-73. OML appears to state the securitized revenue cost for payment of the bonds and billed to the customer is also a fuel cost subject to a franchise fee.
¶15 OG&E and Summit explained why franchise fees may not be collected contemporaneously to a customer's purchase. OG&E argued that franchise fees are not applied to gas costs when incurred, because the Purchase Gas Adjustment Clause (PGA) and the Fuel Adjustment Clause requires a calculation "that's done over a period of time," Id. O.R. at 77. OG&E further explained a tariff states "exactly how we handle our gas costs purchases and it flows through that PGA in a very specific manner to bill its customers...[a]nd then the franchise fee is charged on our bills itself, which includes the fuel costs." Id. O.R. at 77-78. Summit explained its recovery of gas costs from customers occurs through its Gas Supply Recovery rider and costs associated with the February 2021 storm "were not to be collected until, to start with, in the fall of 2021." O.R. at 89. He noted the Regulatory Asset Order pursuant to the February 2021 Regulated Utility Consumer Protection Act occurred prior to fall 2021, and the extraordinary winter storm fuel costs did not then exist for application of the GSR as a "fuel cost" and calculation of a franchise fee. Id.
¶16 The record appears to show that by the time adjusted fuel costs for the February 2021 event would normally be calculated in the fall of 2021 and franchise fees applied thereto, these fuel costs were considered by the Commission to be no longer fuel costs associated with a tariff calculation, but fuel costs converted into a bond obligation subject to a then contemporaneous bond approval process. A municipal gross receipts tax pursuant to 66 O.S.2021, §2601, is levied for a term "of not less than one (1) year," and "shall be payable monthly."
¶17 On August 18, 2022, the Commission issued its Final Order and concluded the utilities could not collect from customers any franchise fees or gross receipts taxes if such fees and taxes were based on securitization property or securitized revenue for the ratepayer-backed bonds. The only relief or command actually ordered in Final Order states as follows.
THE COMMISSION THEREFORE ORDERS that Respondents are not authorized to bill customers for any franchise fees, municipal fees or taxes, and/or 68 O.S. § 2601
Final Order, O.R. at 333. However, the portion of the Final Order characterized as "Findings of Fact and Conclusions of Law" contains the following.
Respondents expressed concerns that they may be precluded from seeking recovery from the Commission for any past or future Franchise-Related Payments on securitization charges upon a finding by a court of competent jurisdiction or subsequent legislation that Franchise-Related Payments should be assessed on securitization charges. However, this order does not prohibit the future filing of applications and proceedings seeking such recovery in subsequent Commission cases.
Final Order, O.R. at 332. The Final Order also contains the following statement.
To the extent there is a disagreement or a dispute between utilities and those entities claiming they are owed Franchise-Related Payments, the Commission would not be the proper forum for such dispute(s). Further, counsel for OML acknowledged that due to the hundreds, if not thousands, of agreements, he could not speak to the particulars of each.
Id. The Final Order of the Commission states it should be construed as possessing no legal effect upon municipal franchise fees owed, or claimed to be owed, from the extraordinary fuel costs that were not billed to the customers but incorporated into bonds issued pursuant to the February 2021 Regulated Utility Consumer Protection Act.
¶18 The dissenting Commissioner's opinion references arguments by counsel. The Commissioner's dissenting opinion does highlight certain "facts" stated in the arguments by counsel to address the nature of the controversy. The Commissioner concludes that approximately 60-100 million dollars is owed to cities and towns due to unpaid franchise fees and municipal taxes. This Commissioner noted during the hearing: "[I]t was mentioned it might be 10 cents per month per customer . . . Do you have any idea what kind of money we're talking about?" Hearing Transcript, O.R. at 24. PUD responded with the following
Commissioner, we are talking about the franchise fees and gross sales tax receipts that would otherwise be collected from customers on this over three billion dollars worth of fuel. So I'm sure it would be substantial.
I don't know the individual contracts that are entered into between the utilities and municipalities, but we're talking about a great deal of money.
Id. at 24. OML responded with an estimated amount sought by the Commissioner.
Commissioner, I met with our finance folks about it and they are anticipating on the franchise fee side, it would be about 10 cents, like you indicated, per month, per account.
Hearing Transcript, O.R. at 24-25. When the Commissioner pressed on a total amount at issue, OML stated the hundreds of individual municipal/utility contracts would need to be reviewed to provide an accurate number. Id. O.R. at 25. Upon being pressed again for an accurate number of dollars in dispute, OML stated "I think to get the estimate we would just take the total number of houses per month and times it by that 10 cents." Id. O.R. at 25. ¶19 OG&E initially planned to bill a customer for franchise fees, apparently based upon a customer's securitization payment or a portion thereof, and then OG&E decided to not seek to bill this amount upon learning of the PUD's application to prevent such billing. Dissenting Opinion, O.R. at 333B. This Commissioner also pointed out ONG stating if the Commission did not grant the PUD's application, then ONG "would have to determine whether or not, based on our individual franchise agreements, is assessing it [a franchise fee] on a securitization charge is appropriate." Id. The dissenting Commissioner also argued that any disagreements on whether franchise fees could be assessed against the securitization charge was an issue to be litigated in Oklahoma's District Courts. This Commissioner argued for denying the PUDs application.
II. Preliminary Issues
¶20 Oklahoma City filed a petition in error challenging the Commission's Final Order. The Corporation Commission filed a motion to dismiss this petition in error. The motion to dismiss was denied by an order the Court on March 6, 2023.
¶22 The OML filed a timely response to the petition in error. The OML's response did not indicate an interest against reversing the Commission's Order, but aligned itself with appellant in challenging the Order. The Court requested the OML to clarify its request for appellate relief due to its statement in its response. OML filed a "cross-petition in error" in July 2023.
¶23 The OML's filing is not a usual cross-appeal or counter-appeal.
¶24 The issue of the OML's standing was raised and a decision on this deferred until disposition on the merits of the appeal. Generally, an association's standing is based upon members of that association possessing standing to sue in their own right.usually based upon its members possessing a "'direct, immediate and substantial'" interest in the controversy and a "personal stake in the outcome."
From any action of the Corporation Commission prescribing rates, charges, services, practices, rules or regulations of any public utility or public service corporation, or any individual, person, firm, corporation, receiver or trustee engaged in the public utility business, an appeal may be taken by any party affected, or by any person deeming himself aggrieved by any such action , or by the State, directly to the Supreme Court....
Okla. Const. Art. IX, § 20. In Henry v. Southwestern Bell Telephone Co., 1991 OK 134825 P.2d 1305Henry, the Commission concluded a statutory change caused a utility to possess less tax liability, and the AARP unsuccessfully argued its members should receive refunds due to this statutory change. Id. 1991 OK 1341991 OK 134
¶25 The OML was allowed to intervene by a vote of the Commission. The OML argued newly created statutes could not change utility tariff "charges" in the nature of franchise fees and gross receipts taxes because the fees and taxes were legal obligations of the utilities created prior to the newly enacted statutes, i.e., the obligations were vested property rights not subject to retroactive extinguishment. The Commission restricted its ruling by including a finding that franchise fees could be imposed in the future if a court of record required such result. However, the Commission's Order ruled that municipal franchise fees based upon winter storm fuel costs would not be made part of tariff charges upon securitization property. OML possessed standing to participate in the Commission proceeding brought to prevent utilities from collecting franchise fees and gross receipts taxes based upon the winter storm fuel costs. Henry v. Southwestern Bell Telephone Co., supra.
¶26 The City argues on appeal: (1) The Order is an unlawful cancellation of municipal sales taxes on parts of utility billings; (2) The Order creates an indirect cancellation of municipal franchise fees; (3) The Commission's Order is an exercise of jurisdiction not possessed by the Commission; (4) The Order does not address liability of utilities for franchise fees and municipal taxes while preventing their collection; (5)The bond revenue collected is ultimately for a taxable sale of fuel costs; and (6) The Commission has no authority to interfere with municipal franchise agreements and municipal tax liability of utilities. The OML argues similar issues and adds additional arguments stating the Commission was required to provide notice to the cities and towns affected by the Commission's Order when attempting to act in a judicial capacity.
III. Appellate Review
¶27 OML and the City of Oklahoma City (Oklahoma City) state this controversy concerns franchise fees, municipal taxes, utility tariffs, the jurisdiction of the Commission, application of the February 2021 Regulated Utility Consumer Protection Act, and the constitutional authority of our Legislature. Oklahoma City and OML argue the Commission did not possess jurisdiction to award the relief in the Final Order, no deference should be given to any portion of the Commission's order, de novo appellate review is proper due to appellant's constitutional claims, and the Commission should have clarified when exercising judicial or legislative functions with proper notice and procedure for one or both of these functions.
¶28 One Commissioner raised the issue whether PUD was requesting the Commission to act judicially or legislatively.
Sometimes around here we get asked, is the case legislative or judicial . . . So I'm somewhat curious as to whether deciding this matter that's before us today is a policy question. And if it is a policy determination, it might involve considerations like the Legislature gives all the time.
You have trade-offs. You have balancing, and this time we have cities and towns that are parties to the case.
. . . How many think this is a legislative case? Would you hold up your hand. . . . All right. How many think its judicial?
Hearing Transcript, O.R at 26-7 (material omitted). One counsel appearing for the Attorney General stated the proceeding was a mixture of judicial and legislative authority. Id. at 27.
¶29 The Commission has authority to act in "legislative," "judicial," (quasi-judicial), "executive," and "administrative" roles based upon the legal nature of the controversy upon which the Commission's authority is applied, and relief granted by the Commission pursuant to authority granted by the Oklahoma Constitution and statutes.St. Louis & S.F. Railroad Co. v. State of Oklahoma, 1925 OK 541244 P. 440
¶30 The appellee defends the Commission's Order as a conditional legislative determination that excludes a certain type of franchise fees and taxes, i.e., if a utility requests a tariff where franchise fees and municipal gross receipts taxes are based upon a customer's securitization payment, or a portion thereof, then such will necessarily be denied by the Commission unless an Oklahoma District Court issues an order requiring payment of such franchise fees and municipal taxes from the utilities. OML and Oklahoma City read the Final Order as declaring liability on present and past facts, determining a legal charge, and exercising a judicial (quasi-judicial) authority.
¶31 The Commission's Order was the result of arguments of counsel at a hearing before the Commissioners. The Commission's Final Order references several statements of law in its Order, and the Order is based upon the Commission construing certain statutes. The Final Order does reference facts such as filing dates and notices provided to the parties in this Commission proceeding.
¶32 The Final Order makes statements of fact with reference to facts purportedly present in previous Commission proceedings that resulted in the financing orders issued pursuant to the February 2021 Regulated Utility Consumer Protection Act. The Commission did not address principles of res judicata
¶33 The Commission's procedure herein and reliance upon facts used by arguments of counsel appears to be an exercise of a legislative function. A legislative power does not include fact-finding in the form of predetermining an adjudicative fact for a judicial proceeding.
¶34 The Final Order contains a segment titled "Findings of Fact and Conclusions of Law," composed of an introductory paragraph and twenty-four unnumbered paragraphs for findings of fact and conclusions of law. Statements of fact or those of combined of fact and law in this segment are as follows.
Second paragraph: States date when PUD filed its Application, notices provided, and Commission's legal conclusion notice was proper.
Third paragraph: "PUD requested the Commission issue an order prohibiting Respondents from billing customers for any franchise fees, municipal fees of taxes, and.or 68 O.S. §2601

Fifth paragraph: States respondents are utilities.
Sixth paragraph: States established rates are billed to customers by Commission-approved tariffs.
Seventh paragraph: States respondents bill customers for franchise fees by Commission-approved tariffs.
Eighth paragraph: States Commission previously entered orders authorizing respondents "to deviate from their respective fuel adjustment/purchase clause tariffs and defer collecting fuel and purchased power costs incurred during the Weather Event until . . . approval in a subsequent Commission proceeding." (Material omitted).
Ninth paragraph: States The February 2021 Regulated Utility Consumer Protection Act was enacted in response to the February 2021 Weather Event.
Eleventh paragraph: States each of the respondents previously sought relief pursuant to the February 2021 Regulated Utility Consumer Protection Act, and the deferred collection of purchased fuel and power costs were made part of the securitization property under previous financing orders of the Commission. The Commission footnotes several previous proceedings concerning this Act.
Nineteenth paragraph: Identifies the "concerns" raised by OML as a finding of fact, and states two conclusions, "The Commission agrees that it does not have jurisdiction related to contractual terms of such [franchise] agreements. However, the Commission is vested with the exclusive authority with respect to the ratemaking of utilities and the charges they seek to collect from their ratepayers concerning Franchise-Related payments."
Twentieth paragraph: "As represented by counsel, each respondent reportedly charged, collected, and paid its respective Franchise-Related Payment pertaining to the Weather Event--on a normalized basis. . . . Any excess fuel, purchased power and/or natural gas commodity costs became part of the securitization property under the financing orders." (Material omitted).
Twenty-first paragraph: "The Act as well as the financing orders specify the amounts received from customers through the applicable securitization mechanisms authorized in the financing orders . . . ."
Twenty-second paragraph: "In each of the financing orders, the Commission set forth an authorized amount and how it is to be recovered through the securitization mechanism."
Final Order, O.R. at 329-332. Findings of fact related to "franchise fees" are limited to the following, (1) A request by PUD to prevent collection of franchise fees if "based upon" securitized revenue payments; (2) Customers are billed for franchise fees through Commission approved tariffs; (3) The Commission does not possess jurisdiction related to "contractual terms" in franchise agreements; and (4) The Commission's Order does not prevent a utility from seeking permission from the Commission if a District Court rules that additional franchise fees are owed by the utilities.
¶35 No finding of fact or conclusion of law is made concerning the date when a utility possesses a legal obligation to pay an agreed franchise fee pursuant to a franchise agreement (or mandated by law and incorporated into the agreement),74 O.S. §9070-§908117 O.S. §§ 15168 O.S. §2601
¶36 When provided with an opportunity to explain why the PUD filed its application, a representative for the Public Utilities Division argued: "[N]o one should receive a windfall from this winter weather emergency, and that's what would occur if these franchise fees, gross sales taxes were paid to municipalities." Hearing Transcript, O.R. at 40. The representative was asked if this opinion was "just the opinion of the Public Utility Division," or "in the statute," and he responded with the following.
That's just the opinion of the Public Utility Division, Commissioner. Again, the cost of fuel during this period of time was astronomical. And so, franchise fees paid on this would be astronomical.
Id. at 40. PUD's stated reason for filing its application, an opinion concerning "astronomical" franchise fees, was not made one of the findings by the Commission. PUD's application stated it was filed pursuant to Okla. Const. Art. IX, §§ 18-19, and "17 O.S. §§151et seq.," which includes the Commission's authority of "general supervision over all public utilities to, with power to fix and establish rates and to prescribe and promulgate rules, requirements and regulations, affecting their services, operation, and the management of the business thereof, and the method in which it is conducted." 17 O.S.2021 §152
¶37 Reviewing decisions by the Commission is divided between: (1) Appeals adjudicating assignments of error raising a violation of any right of the parties under the Constitution of the United States of the Constitution of the State of Oklahoma when the Court exercises its own independent judgment as to both the law and the facts of record; and (2) All other appeals when the Court determines whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence.
¶38 A single appeal may involve applying both standards of review in Art. IX, §20.
¶39 Apart from the claims based upon our State Constitution, our review is non-deferential and de novo for the Commission's Order to the extent the appellate adjudication reviews assignments of error challenging the Commission's statutory construction on non-constitutional grounds.
IV. Appeal
¶40 The Commission essentially concluded a municipal franchise fee (and gross receipts tax) are contrary to statutory law when the fee and tax are "based upon" securitization revenue customer payments. The Commission's unstated approach to this controversy is: A utility's collection for this "unlawful" (or contrary to statutory law) franchise fee/gross receipts tax is similar to a utility's collection for unreasonable cost or expense of a utility that the Commission routinely examines when determining the reasonableness of a utility's tariffs/rates.
¶41 However, for the purpose of this controversy distinctions must be made when: (1) A utility requests to seek Commission approval for the utility's business expenses; (2) A utility's request for approval of a business expense including an unreasonable business expense; (3) A utility's business expenses outside of Commission oversight; (4) A utility requesting a tariff to include franchise fees and tax obligations; and (5) Legal tax or franchise fee liability of a utility is determined upon a judicial request by a utility or sua sponte by the Commission.
¶42 In Turpen v. Oklahoma Corporation Commission, 1988 OK 126769 P.2d 1309reasonableness of costs and expenses between affiliates.
Throughout the United States it is recognized that a public utility's dealings with affiliates require thorough investigation and close scrutiny by a public utility commission. It is generally held that, while the regulatory agency bears the burden of proving that expenses incurred in transactions with nonaffiliates are unreasonable, the utility bears the burden of proving that expenses incurred in transactions with affiliates are reasonable.
Id. 1988 OK 126769 P.2d 1309State v. Oklahoma Gas & Electric Company, 1975 OK 40536 P.2d 887Id. at ¶22, 536 P.2d at 891 (quoting Lone Star Gas Co. v. Corporation Commission, 1934 OK 39639 P.2d 547
¶43 In a general sense, a utility may request whether a business expense or costs may be included in a tariff subject to approval. For example, we have explained a utility "could not exhibit improvident expenditures to justify a rate increase," and we explained "charitable contributions" could not be reasonable operating business expenses for the purpose of an increase in a rate/tariff. State v. Oklahoma Gas & Electric Company, 1975 OK 40Id.
¶44 This general legal authority to examine utility expenses and costs in utility rate proceedings is limited in some circumstances, and two of these limitations are present in the Commission's Order concerning legal liability for franchise fees and gross receipts taxes. First, the Commission may not review a utility's "business discretion." Second, the Commission may not by quasi-judicial adjudication or legislative determination decide the existence of a utility's legal liability when the specific liability is an issue determined by a different governmental entity by our Constitution or statutes.
¶45 An example of the Commission' s infringement upon a utility's business discretion was explained in Lone Star Gas Co. v. Corporation Commission, supra, where we stated the following.
The powers of the Commission are to regulate, supervise, and control the public service companies in their services and rates, but these powers do not extend to an invasion of the discretion vested in the corporate management. It does not include the power to approve or disapprove contracts about to be entered into, nor to the approval or veto of expenditures proposed. The powers of the Commission, as respects the acts of public service companies, are limited to an investigation of these acts to determine whether or not they have a reasonable and fair effect upon the rights of the public, and to take steps to avoid an unreasonable or unfair or prejudicial effect upon the public rights, if such be found.'
1934 OK 396Oklahoma Gas & Electric v. Corporation Commission, 1975 OK 15543 P.2d 546Lone Star Gas Co., supra, and discussed the Commission's lack of a general power to substitute its own judgment "for that of the utilities concerning their internal management and control." Id. 1975 OK 15
¶46 The Commission's approach to this controversy is that it did not infringe upon the internal management and control of a utility when the Commission determined on a sua sponte application that a utility had no gross receipts tax liability and no contractual municipal franchise fee liability in a particular factual circumstance by the Commission applying a particular statute to that circumstance. We disagree with this assessment by the Commission. While we agree the Commission may consider a utility's tax liability when fashioning the utility's reasonable rate of return,
¶47 In one sense, the Commission did not claim for itself a power to make a universally legal and binding decision on tax liability and contract liability, since it left legal liability for potential future litigation in a District Court. But the effect of the Commission's ruling is that a particular and potential utility tax and contract liability, even if recognized by the utility with their own accounting/business practices, would not be recognized as such by the Commission until a court of law gave its approval to the tax and contract liability.
¶48 The Legislature may create an exception and grant Commission authority involving internal management decisions.
If this act, or any provision hereof is, or may be deemed to be, in conflict or inconsistent with any of the provisions of Section 18 through Section 34, inclusive, of Article IX of the Constitution of the State of Oklahoma, then, to the extent of any conflicts or inconsistencies, it is hereby expressly declared this entire act and this section are amendments to and alterations of such sections of the Constitution of the State of Oklahoma, as authorized by Section 35 of Article IX of the Constitution of the State of Oklahoma.
74 O.S.2021 § 9081
¶49 The appellate record contains ONG's Final Finance Order referencing ONG's Extreme Purchase Costs, as well as "Extraordinary Costs and other associated costs . . . [and] [t]hese costs include ONG financing costs, ONG carrying costs until bond issuance, ONG legal and consulting costs, as well as ODFA upfront costs for the issuance of Bonds after an order in this Cause." O.R. at 258. The terms "franchise," "franchise fees," and gross receipts taxes" do not appear in the Final Finance Order as expressly listed costs incurred by ONG in association with the sale or delivery of increased amount of gas during the extreme weather event. Id.
¶50 The Order references "extreme purchase costs and the extraordinary costs authorized pursuant to 74 Okla.Stat. §9073(F)," which references therein extreme purchase costs and extraordinary costs."74 O.S.2021, §9072related to the extreme weather . . . included but not limited to...." costs specified therein.purchase of fuel by the utility. This section does not expressly reference either a municipal franchise right or gross receipts taxes.
¶51 An examination of language in 74 O.S. §9070 - §9082, inclusive, reveals that none of these statutes expressly mention franchise fees or gross receipts taxes. The Commission's Findings of Fact and Conclusions of Law makes one, and only one, reference to "taxation" in the Act.
Title 74 O.S. § 9077
Final Order, O.R. 328-333, at 331. The Court looks at the plain and ordinary meaning of language in a statute unless the language clearly shows the Legislature intended a different meaning.74 O.S. §9077
¶52 Generally, a municipality may create a franchise contract with a utility and grant the utility the right to sell its services in the municipality to the exclusion of other utilities, and a quid pro quo for granting this right is payment of franchise fees by the utility to the municipality. In some circumstances, a franchise is construed as a type of property with a franchise fee as a purchase price or rent for this property, and the fee is usually not construed as a "tax."
¶53 Nothing in the February 2021 Regulated Utility Consumer Protection Act references a franchise fee property right, or states, or implies, that such right is one diminished by a derived police power exercised pursuant to the Act.
¶54 Nothing in the February 2021 Regulated Utility Consumer Protection Act references municipal gross receipts taxes. Our Constitution does reference "taxation" with the Commission's authority.
In all matters pertaining to the public visitation, regulation, or control of corporations, and within the jurisdiction of the Commission, it shall have the powers and authority of a court of record, to administer oaths, to compel the attendance of witnesses, and the production of papers, to punish for contempt any person guilty of disrespectful or disorderly conduct in the presence of the Commission while in session, and to enforce compliance with any of its lawful orders or requirements by adjudging, and by enforcing its own appropriate process, against the delinquent or offending party or company (after it shall have been first duly cited, proceeded against by due process of law before the Commission sitting as a court, and afforded opportunity to introduce evidence and to be heard, as well against the validity, justness, or reasonableness of the order or requirement alleged to have been violated, as against the liability of the company for the alleged violation), such fines or other penalties as may be prescribed or authorized by this Constitution or by law. The Commission may be vested with such additional powers, and charged with such other duties (not inconsistent with this Constitution) as may be prescribed by law, in connection with the visitation, regulation, or control of corporations, or with the prescribing and enforcing of rates and charges to be observed in the conduct of any business where the State has the right to prescribe the rates and charges in connection therewith, or with the assessment of the property of corporations, or the appraisement of their franchises, for taxation, or with the investigation of the subject of taxation generally. Any corporation failing or refusing to obey any valid order or requirement of the Commission, within reasonable time, not less than ten days, as shall be fixed in the order, may be fined by the Commission (proceeding by due process of law as aforesaid) such sum, not exceeding five hundred dollars, as the Commission may deem proper, or such sum, in excess of five hundred dollars, as may be prescribed or authorized by law; and each day's continuance of such failure or refusal, after due service upon such corporation of the order or requirement of the Commission, shall be a separate offense: Provided, That should the operation of such order or requirement be suspended, pending any appeal therefrom, the period of such suspension shall not be computed against the company in the matter of its liability to fines or penalties.
Okla. Const. Art. IX, § 19 (emphasis added). A grant of power to the Commission pursuant to this section must necessarily be based upon "public duties and obligations" of a utility with respect to "where the State has a right to prescribe the rates and charges" of a utility.
¶55 The Commission's Order states utilities may not bill customers for franchise fees, municipal fees or taxes, and/or 68 O.S. §2601unless a District Court concludes otherwise. First, a District Court judgment is not necessary to create a legal liability for a utility. A legal obligation may be created or arise by various sources, e.g., common law, municipal ordinances, Federal or State administrative rules, Federal or State statutes, and Federal or State Constitutions. These sources of law apply to a person's conduct without an expression of judicial recognition applying law to the person's conduct, and the Commission does not need a judicial expression of a utility's tax liability to consider such liability when determining a utility's rates.
¶56 The February 2021 Regulated Utility Consumer Protection Act does not give the Commission the authority to determine a utility's gross receipts tax liability or determine such liability is legally unenforceable via a utility rate or tariff because of that Act.
V. Conclusion
¶57 The Oklahoma Municipal League possessed standing to appear in the controversy. The Commission's determination that the February 2021 Regulated Utility Consumer Protection Act changed, amended, or altered a utility's legal obligations concerning municipal franchise fees and gross receipts taxes is a determination not sustained by law and must be reversed.
¶58 Corporation Commission Order No.727704, in Case No. PUD2022-000073, is REVERSED. Okla. Const. Art. IX, §20. The matter is remanded to the Corporation Commission.
¶59 CONCUR: KANE, C. J.; KAUGER, WINCHESTER, EDMONDSON, COMBS, GURICH, and DARBY, JJ.
¶60 CONCUR BY SEPARATE OPINION: ROWE, V.C.J.
¶61 NOT PARTICIPATING: KUEHN, J.

FOOTNOTES

68 O.S.2021, §2601

74 O.S.2021, §9070-§908174 O.S.2021 § 9070
The Legislature also created the "February 2021 Unregulated Utility Consumer Protection Act,"codified at 74 O.S. § 9050-§9059

. In re Application of the Okla. Dev. Fin. Auth. for Approval of Not to Exceed $95,000,000 Ratepayer-Backed Bonds, 2022 OK 49511 P.3d 1044In re Application of Okla. Dev. Fin. Auth. for Approval of $725,000,000 Ratepayer-Backed Bonds, 2022 OK 48511 P.3d 1048In re Application of Okla. Dev. Fin. Auth. For Approval of $1,450,000,000 Ratepayer-Backed Bonds, 2022 OK 47511 P.3d 1052In re Application of Okla.Dev. Fin. Auth. For Approval of Not to Exceed $800,000,000 Ratepayer-Backed Bonds, 2022 OK 41510 P.3d 165

See, e.g., O.A.C.165:45-15-2 and 165:135-5-1, and AviComm, Inc. v. Pub. Utils. Comm'n, 955 P.2d 1023

Duncan Med. Serv's. v. State ex rel. Okla. Tax Comm'n, 1994 OK 91911 P.2d 247First Nat. Bank of Stillwater v. State ex rel. Okla. Tax Comm'n, 1970 OK 33466 P.2d 64468 O.S.2021, §§ 2601supra note 1 and infra at note 7.

68 O.S.2021, §2603

Pub. Serv. Co. of Okla. v. State ex rel. Okla. Corp. Comm'n, 2005 OK 47115 P.3d 861Id.

2002 OK 7155 P.3d 1072

Okla. Educ. Ass'n v. State ex rel. Okla. Legislature, 2007 OK 30158 P.3d 1058citing Hendrick v. Walters, 1993 OK 162865 P.2d 1232

But see, e.g., Southwestern Bell Tel. Co. v. Okla. Corp. Comm'n, 1994 OK 38873 P.2d 1001cert. den., 513 U.S. 869, 115 S.Ct. 191, 130 L.Ed.2d 123 (1994); (legislative nature of the Commission proceeding is sufficient to deny a party's requested extraordinary writ relief, and the dissent by Opala, J., stating judicial relief is available in some circumstances when an exercise of individual ratemaking by Commission also possesses an adjudicatory nature or attributes).

Southwestern Bell Tel. Co. v. Okla. Corp. Comm'n, supra note 12 at 1994 OK 38Okla. Cotton Ginners' Ass'n v. State, 1935 OK 100451 P.2d 327

In re Application of Okla. Gas & Elec. Co., 2018 OK 31417 P.3d 1196citing Cox Okla. Telecom, LLC, 2007 OK 55164 P.3d 150Southwestern Bell Tel. Co. v. Okla. Corp. Comm'n, 1994 OK 38873 P.2d 1001Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 226, 29 S.Ct. 67, 53 L.Ed. 150 (1908)); Okla. State Med. Ass'n v. Corbett, 2021 OK 30489 P.3d 1005

In re Application of Okla. Gas & Elec. Co., 2018 OK 31417 P.3d 1196citing Prentis, supra note 14, at 211 U.S. at 226; Cox Okla.Telecom, LLC, supra note 14, at 2007 OK 55

In re Application of Okla. Gas & Elec. Co., supra note 15 at 2018 OK 31citing Wiley v. Okla. Natural Gas Co., 1967 OK 152429 P.2d 957Turpen v. Okla. Corp. Comm'n, 1988 OK 126769 P.2d 1309

See, e.g., Satellite Sys., Inc. v. Birch Telecom of Okla., Inc., 2002 OK 6151 P.3d 585

In re Application of Okla. Gas & Elec. Co., supra note 15 at 2018 OK 31

C.F. Braun & Co. v. Corp. Comm'n, 1987 OK 52739 P.2d 510C.F. Braun & Co. v. Corp. Comm'n, 1980 OK 42609 P.2d 1268Wilson v. Okla. Horse Racing Comm'n, 1996 OK 3910 P.2d 1020

Berkson v. State ex rel. Askins, 2023 OK 70532 P.3d 36

cf. Okla. Nat. Gas v. Corp. Comm'n, 1923 OK 400216 P. 917C.F. Braun & Co. v. Corp. Comm'n note 19 supra.

Hill v. American Med. Response, 2008 OK 57423 P.3d 1119

Cox Okla. Telecom, LLC, 2007 OK 55164 P.3d 15012 O.S.2021 § 2202quoting Davis, K., Administrative Law, p. 296 (1972)); see, e.g., Haley N. Proctor, Rethinking Legislative Facts, 99 Notre Dame L. Rev. 955, 970 (2024) (quoting Kenneth Culp Davis, An Approach to Problems of Evidence in the Administrative Process, 55 Harv. L. Rev. 364, 402 (1942) (Generally, when an administrative agency finds facts concerning parties before the agency to determine rights and duties with regard to the parties, then the agency performs an adjudicative function and makes findings of "adjudicative facts." But when an agency "wrestles with a question of law or policy, it is acting legislatively" and the facts which inform the legislative judgment are "legislative facts."); Peggy C. Davis, "There Is a Book Out ...": An Analysis of Judicial Absorption of Legislative Facts, 100 Harv. L. Rev. 1539, n.1, & 1539-40 (1987) (quoting Davis, An Approach to Problems of Evidence, supra, and E. Cleary, McCormick on Evidence, § 331, at 928 (3d ed. 1984)).

Legislative Facts and Similar Things: Deciding Disputed Premise Facts, 73 Minn. L. Rev. 1, 8-9, nn.19-21 (1988) (premise facts "are facts that explicitly or implicitly serve as premises used to decide issues of law" including "legislative facts which legislatures use as premises to enact statutes"); Todd S. Aagaard, Factual Premises of Statutory Interpretation in Agency Review Cases,77 Geo. Wash. L. Rev. 366, 382-383 (2009) (relying on Keeton, Legislative Facts, supra); Yocum v. Greenbriar Nursing Home, 2005 OK 27130 P.3d 213

MCI Commc'ns Corp. v. State, 1991 OK 86823 P.2d 351Pub. Serv. Co. of Okla. v. State ex rel. Okla. Corp. Comm'n, supra note 8 at 2005 OK 47Samson Res. Co. v. Okla. Corp. Comm'n, 1987 OK 73742 P.2d 1114infra, at note 28.

In re Vose, 2017 OK 3390 P.3d 238

Cox Okla. Telecom, LLC v. State ex rel. Okla. Corp. Comm'n, supra note 23, at 2007 OK 55

Cox Okla. Telecom, LLC v. State ex rel. Okla. Corp. Comm'n, supra note 23, at 2007 OK 55Carter Oil v. State, 1951 OK 272240 P.2d 787H & L Operating Co. v. Marlin Oil Corp., 1987 OK 39737 P.2d 565

Henry v. Corp. Comm'n, 1990 OK 104825 P.2d 1262

H & L Operating Co. v. Marlin Oil Corp., 1987 OK 39737 P.2d 565

Dobson Tel. Co. v. State ex rel. Okla. Corp. Comm'n, 2019 OK 25441 P.3d 156as well as statutory interpretation dictate our de novo review.") (emphasis added and material omitted); Okla. Gas & Elec. Co. v. State ex rel. Corp. Comm'n, 2023 OK 33535 P.3d 1218de novo review of assigned error of law was proper when reviewing Commission's construction of state statute).

Pub. Serv. Co. of Okla. v. State ex rel. Corp. Comm'n ex rel. Loving, 1996 OK 43918 P.2d 733Ranola Oil Co. v. Corp. Comm'n of Okla.,1988 OK 28752 P.2d 1116

See, e.g., In re Medicine Park Tel. Co., 2019 OK 21441 P.3d 113Pioneer Tel. & Tel. Co. v. Westenhaver, 1911 OK 47118 P. 354

State v. Okla. Gas & Elec. Co., 1975 OK 40in excess of franchise fees or charges required by enforceable contract).

Okla. Gas & Elec. v. Corp. Comm'n, 1975 OK 15

Tucker v. Special Energy Corp., 2008 OK 55187 P.3d 730

Okla. Cnty. Util. Services Auth. v. Corp. Comm'n, 1970 OK 28478 P.2d 352cf. Southeastern Okla. Develop. and Gas Auth. v. Okla. Corp. Comm'n, 1980 OK 16606 P.2d 574State ex rel. Corp. Comm'n v. Texas Cnty. Irr. and Water Res. Ass'n, Inc., 1991 OK 63818 P.2d 449Merritt v. Corp. Comm'n, 1968 OK 19438 P.2d 495

Okla. Nat Gas v. Corp. Comm'n, 1923 OK 400216 P. 917

See, e.g., In re Application of Okla. Gas & Elec. Co., 2018 OK 31417 P.3d 1196

74 O.S.2021, §9073

74 O.S.2021 §9072

74 O.S.2021 §9072

74 O.S.2021 §9072

Fanning v. Brown, 2004 OK 785 P.3d 841

See, e.g., King County v. King County Water Dist. No. 20, 194 Wn.2d 830, ¶17, 453 P.3d 681, 687 (2019) ("The utilities argue that franchise compensation is an unauthorized and therefore unlawful tax. But courts have consistently rejected similar arguments, instead characterizing charges like the franchise compensation at issue here as charges in the nature of rent."), citing City of St. Louis v. W. Union Tel. Co., 148 U.S. 92, 97, 13 S. Ct. 485, 37 L. Ed. 380 (1893); Jacks v. City of Santa Barbara, 3 Cal. 5th 248, 262, 267, 397 P.3d 210, 219 Cal. Rptr. 3d 859 (2017); Jacks v. City of Santa Barbara (2017) 3 Cal.5th 248, 219 Cal.Rptr.3d 859, 397 P.3d 210, 218 ("A franchise to use public streets or rights-of-way is a form of property...and a franchise fee is the purchase price of the franchise...Historically, franchise fees have not been considered taxes.") (citations omitted).

Shepard v. Okla. Dept. of Corrections, 2015 OK 8345 P.3d 377Marathon Oil Co. v. Corp. Comm'n, 1994 OK 28910 P.2d 966

Okla. Gas & Elec. v. Corp. Comm'n, 1975 OK 15543 P.2d 546Southern Oil Corp. v. Yale Nat. Gas Co., 1923 OK 129214 P. 131Wagoner Gas Co. v. State, 1933 OK 40723 P.2d 645see also St. Louis-San Francisco Ry. Co. v. State, 1953 OK 335268 P.2d 845

Marathon Oil Co. v. Corp. Comm'n, 1994 OK 28910 P.2d 966

Id.

 

 

ROWE, V.C.J., CONCURRING:
¶1 I concur with the Court's judgment insofar as it reverses the order of the Corporation Commission. I write separately to highlight the question that is unspoken: How much more money will ratepayers be required to pay for the 14-day winter storm that occurred in 2021?
¶2 In February 2021, record-setting cold temperatures plagued the State of Oklahoma for fourteen (14) days, revealing a shortage of natural gas. Oklahoma utility companies continued to purchase natural gas at incredibly high prices, which exceeded their entire fuel acquisition cost for all of 2020. In the Matter of Application of the Okla. Dev. Fin. Auth., 2022 OK 41510 P.3d 165
¶3 The pertinent utility companies each filed for relief under the Act and financing orders were subsequently issued by the Corporation Commission. This Court reviewed and approved utility company bonds pursuant to the Act in In re Application of Oklahoma Development Finance Authority For Approval of Not to Exceed $800,000,000 Ratepayer-Backed Bonds, 2022 OK 41510 P.3d 165In re Application of Oklahoma Finance Authority for Approval of $1,450,000,000 Ratepayer-Backed Bonds, 2022 OK 47511 P.3d 1052In re Application of Oklahoma Finance Authority for Approval of $725,000,000 Ratepayer-Backed Bonds, 2022 OK 48511 P.3d 1048In re Application of the Oklahoma Development Finance Authority for Approval Not to Exceed $95,000,000 Ratepayer-Backed Bonds, 2022 OK 49511 P.3d 1044
¶4 Shortly after we approved the bonds, the Public Utility Division filed an Application with the Corporation Commission arguing the Act, as well as the Corporation Commission's financing orders, "clearly limit any collection and billing by the regulated utility to only those items set forth in each utility's respective irrevocable and nonbypassable mechanism, which do not include franchise fees, municipal fees or taxes, and/or 68 O.S. § 2601
¶5 With its Application, PUD requested the Corporation Commission issue an order prohibiting utility companies from billing customers for any franchise fees, municipal fees or taxes, and/or 68 O.S. § 260168 O.S. § 260168 O.S. § 2601
¶6 When utility companies incurred substantial costs from the winter storm, the February 2021 Regulated Utility Protection Act provided that "unprecedented utility costs will be passed through to the Oklahoma customers of utilities from regulated utility entities." 74 O.S. § 9071
¶7 Are the franchise fees and related taxes based upon the winter storm owed to municipalities under the February 2021 Regulated Utility Consumer Protection Act? Are franchise fees and related taxes based upon the winter storm owed under a utility company's respective Franchise Agreement? If so, who is paying the franchise fees associated with the winter storm? Will payment be made from the securitized revenue or from the utility companies' balance sheets? I suppose the answer to these questions will be litigated in the district court. From there, the district court can determine whether the burden of an additional $60-100 million will fall onto the people of Oklahoma.
¶8 I previously expressed my misgivings in prior concurrences relating to substantive questions that stood unanswered. Hereto, there remain too many questions with too few answers. Namely, in its original Exceptions to the Report and Recommendations of the ALJ filed before the Corporation Commission on November 18, 2021, AARP noted the ALJ's Report did not analyze OG&E's claim that "it did not need to engage in hedging activities due to its portfolio approach to keeping multiple supply sources available . . . all while 53% of its gas units, one third of its wind turbines, and certain coal units were not operating during the Winter Weather Event."
¶9 Today, nearly four years after the 14-day winter storm, it remains to be seen whether municipalities will receive their franchise fees and taxes. And, if municipalities are entitled to be paid--and if not from the securitized revenue--it remains to be seen whether the ratepayer will have to cough up more money to pay for this colossal financial event. Although beyond our purview, I cannot help but wonder how many of these catastrophic weather events Oklahoma ratepayers can afford--and what, if anything--has been done to prevent this from happening again.
 

FOOTNOTES

74 O.S. § 9071

Id. at ¶ 2.